**SMITH–BERCH, INC., trading as the White Marsh Institute**

v.

**BALTIMORE COUNTY, Maryland, et al.**

**No. CIV. CCB–98–1821.**

United States District Court, D. Maryland.

Aug. 9, 1999.

2. Robling testified that the apartment is part of the main house and he and his wife pay rent for the entire house including the apartment.

Ellen M. Weber, Washington, DC, for Plaintiff.

Carol Saffran–Brinks, Assistant County Attorney, Baltimore County Office of Law, Towson, MD, for Defendant.

## *MEMORANDUM*

BLAKE, District Judge.

Now pending before the court is Defendants' motion to dismiss or, in the alternative, for summary judgment. This case centers on Plaintiff's contention that, in denying Plaintiff a zoning permit for its proposed methadone treatment program, Defendants violated Plaintiff's rights under the Americans With Disabilities Act ("ADA") and the Due Process Clause of the Fourteenth Amendment.[1] In their motion, Defendants respond by asserting a variety of immunity and substantive defenses that they contend require the court to enter judgment in their favor. This matter has been fully briefed, and oral argument was heard on July 23, 1999. For the reasons that follow, the court will deny Defendants' motion as to Plaintiff's ADA claim, but grant Defendants' motion as to Plaintiff's due process claim.

---

1. Named as defendants in this case are: Baltimore County, Maryland; Baltimore County Executive C.A. Dutch Ruppersberger, III; the Baltimore County Council; Joseph Bartenfelder, the Chairman of the Baltimore County Council; the Baltimore County Department of Permits and Development Management; Arnold Jablon, the Director of the Baltimore County Department of Permits and Development Management; the Office of the Baltimore County Zoning Commissioner; and Baltimore County Deputy Zoning Commissioner Timothy M. Kotroco.

## BACKGROUND

The White Marsh Institute ("WMI") was established in March 1997 by Walter Smith and Neal Berch for the purpose of providing methadone treatment services to individuals with opiate addiction living in the White Marsh area of Baltimore County. Compl. ¶¶ 10, 32. Although controversial, methadone treatment is widely recognized as an effective method for combating the effects of opiate dependence. *See* Pl.'s Opposition, Ex. 10 (statement of Dr. D'Lugoff). Only one other methadone treatment program currently operates in Baltimore County, the Awakenings Drug Treatment Program located in Timonium, which has operated in that location since 1991. Compl. ¶ 21. According to Plaintiff, since 1989 other methadone treatment programs have attempted to locate in the County, but none has succeeded. *Id.* ¶ 30. Plaintiff asserts that there is a pressing need for additional methadone treatment facilities to address the County's "escalating heroin problem." *Id.* ¶¶ 5, 19, 33.[2] Indeed, an official from the State Methadone Authority, in response to WMI's application for state certification, agreed that "it appears that there is sufficient need in the White Marsh area to support additional narcotic treatment in Baltimore County." Pl.'s Opposition, Ex. 2, Att. H.

### A. Methadone Program Licensing Requirements:

To operate lawfully in Maryland, a methadone treatment facility must be licensed by the federal Food and Drug Administration and the federal Drug Enforcement Administration. It also must be certified by three separate agencies of the Maryland Department of Health and Mental Hygiene: the Licensing and Certification Administration, the Alcohol and Drug Abuse Administration (of which the State Methadone Authority is a part), and the Division of Drug Control. *Id.* ¶¶ 24–25. These three state agencies establish and enforce rules and regulations governing the operation of methadone treatment programs throughout Maryland. *See* Def.'s Motion, Ex. 8 (Alcohol and Drug Abuse Administration letter and order explaining certification procedures); Pl.'s Opposition, Ex. 2 (statement of Neal Berch). While WMI acknowledges that it has not yet fully completed the state certification process, *see* Pl.'s Opposition, p. 12 n. 4, it has received the requisite federal licenses and been approved by "at least two" state agencies. *See* Def.'s Motion, Ex. 4 (WMI's July 1997 petition for special hearing). WMI cannot complete the state certification process until it receives local zoning approval. *See* Def.'s Reply, p. 10. Whether WMI has fully complied with the requisite state procedures for operating a methadone treatment facility is irrelevant for purposes of resolving this case, however, as WMI does not allege in its lawsuit that it was improperly denied state certification and the County did not deny WMI's petition for a zoning permit on these grounds.[3]

The basis for WMI's claims in this case is the allegedly discriminatory decision made by various Baltimore County departments and officials to deny it a use permit pursuant to the County's zoning regulations. *See* Compl. ¶¶ 1, 3, 107, 110, 115. Section 102.1 of the Baltimore County Zoning Regulations provides that "[n]o land shall be used or occupied and no building or structure shall be erected, altered, located or used except in conformity with these regulations . . . ." *See also* Balto. County Code § 26–116 (providing for county zoning regulations "to regulate and

---

2. There are more than twelve non-methadone drug treatment programs operating in Baltimore County, including at least six facilities located in or serving the White Marsh area. Def.'s Motion, Ex. 2 (affidavit of Angela Wallace, Baltimore County's Bureau of Substance Abuse Treatment Coordinator).

3. Furthermore, neither the Maryland Department of Health and Mental Hygiene nor any of its agencies or officers has been named as a defendant in this lawsuit.

restrict ... the location and use of buildings, structures, and land for trade, industry, residence, or other purpose"). The Baltimore County Department of Permits and Development Management ("Permits Department") is responsible for administering and enforcing the County's zoning regulations. *Id.* § 2–56; Compl. ¶ 13. Thus, in order to operate a methadone treatment program in Baltimore County, in addition to securing federal and state approval, WMI must obtain a permit from the Permits Department indicating that the proposed use fully complies with the applicable zoning regulations. *See* B.C.Z.R. § 500.1.

### B. The Baltimore County Zoning Process:

In March 1997, WMI located office space for its program at 11450 Pulaski Highway in a small strip shopping center hosting a variety of professional and retail establishments, including a law office, an insurance office, a physical therapist's office, a barber shop, a dry cleaners, and a deli. Compl. ¶ 34; Def.'s Motion, Ex. 4 (Deputy Zoning Commissioner's opinion), p. 2. Surrounding businesses included a sanitary landfill, an automobile repair shop, a self-storage facility, and an adult video store. Compl. ¶ 35. According to Plaintiff, the nearest residential neighborhood was 1.5 miles away. *Id.* ¶ 36.

The Pulaski Highway property that WMI sought to occupy for its methadone treatment facility was designated on the County's zoning map as a B.R.-A.S. (Business, Roadside; Automotive Services) zone. *Id.* ¶ 37; Def.'s Motion, Ex. 4 (Deputy Zoning Commissioner's opinion), p. 2. A B.R. zone is a highly intensive business zone, permitting a large variety of uses as of right, including all of the uses permitted in B.M. (Business, Major) and B.L. (Business, Local) zones. *See* B.C.Z.R. §§ 230, 233, 236; *see also Hayfields, Inc. v. Valleys Planning Council, Inc.,* 122 Md.App. 616, 638, 716 A.2d 311, 322 (1998) ("Within any given zoning classification, the [B.C.Z.R.] prescribes two types of uses:

certain uses are permitted as of right and others are conditionally permissible"). Relevant to this proceeding, among the uses permitted in a B.R. zone as of right are "offices," which includes "medical offices," and "medical clinics." *See* B.C.Z.R. §§ 101 (definitions), 230 (B.L. zone requirements). A "medical office" is defined by the County zoning regulations, in pertinent part, as "[a] place for the treatment of outpatients by one or more medical practitioners." *Id.* § 101. A "medical practitioner," in turn, is defined in pertinent part as "[a] physician ... psychologist ... nurse ... or other similar health professional licensed or certified by the state." *Id.* A "medical clinic," which is expressly (and somewhat confusingly) excluded from the definition of "medical office," is defined in pertinent part as encompassing "ambulatory care centers" and "diagnostic centers." *Id.*

WMI contends that it fits the definitions of both "medical office" and "medical clinic" because it would have been staffed by a licensed psychiatrist who served as medical director, a licensed physician who performed patient examinations, and two licensed nurses who dispensed methadone to the program's clients, who would have been treated on an outpatient basis. Defendants do not dispute WMI's description of the intended staffing and operation of its proposed methadone treatment program. Accordingly, WMI claims that it should have been permitted *as of right* to use the Pulaski Highway property for its program. *See* Compl. ¶¶ 43–44; Pl.'s Opposition, p. 3.

In addition to "medical office" and "medical clinic," there is another land use classification relevant to this dispute: "community care center." Although medical offices and medical clinics are permitted as of right in a B.R. zone, a "community care center" is permitted in a B.R. zone only if its sponsor first obtains a "special exception" from the Baltimore County Zoning Commissioner. *See* B.C.Z.R. §§ 230.13, 502 (setting forth special excep-

tion requirements and procedures). A "community care center" is defined by the zoning regulations, in pertinent part, as

> [a] small-scale facility, sponsored or operated by a private charitable organization or by a public agency and licensed by the Maryland State Department of Health and Mental Hygiene or by the Maryland State Department of Social Services, *for the housing, counseling, supervision, or rehabilitation of alcoholics or drug abusers* ... who are not subject to incarceration or in need of hospitalization.

*Id.* § 101 (emphasis added). One of the central issues in this case is whether WMI constitutes a "medical office" or a "community care center." As explained below, the Deputy Zoning Commissioner who conducted WMI's special zoning hearing concluded that WMI constituted a community care center. *See* Def.'s Motion, Ex. 4 (Deputy Zoning Commissioner's opinion), p. 7. If considered a community care center, WMI is subject to the following additional requirements imposed for obtaining a "special exception":

> Before any special exception may be granted, it must appear that the use for which the special exception is requested will not:
>
> A. Be detrimental to the health, safety or general welfare of the locality involved; .
>
> . . .
>
> C. Create a potential hazard from fire, panic or other danger;
>
> . . .

B.C.Z.R. § 502.1 (quoting relevant portions only). The Zoning Commissioner (or Deputy Zoning Commissioner [4]) makes these determinations following a public hearing. *Id.* §§ 500.5. The commissioner's decision to grant or deny a special exception, based on the above factors, is appealable to the Baltimore County Board of Appeals. *Id.* §§ 500.10, 502. The Board of Appeals' decision affirming or reversing the commissioner, in turn, is appealable to the Maryland Circuit Court for Baltimore County. Md. Ann.Code art. 25A, § 5(U).

In this case, after leasing the Pulaski Highway property, Mr. Smith, acting on WMI's behalf, applied to the Permits Department for a use permit. Initially, Mr. Smith did not inform the department that he was seeking a permit for a methadone treatment program. Instead, he indicated only that he was seeking a permit for an "outpatient counseling center." Based on this information, the department issued a permit authorizing the requested use. After receiving the permit, however, Mr. Smith requested that it be amended to identify the approved use as being a methadone treatment program. Compl. ¶¶ 52–53; Pl.'s Opposition, Ex. 4 (statement of Walter Smith). In response, the Permits Department withdrew the permit and told Mr. Smith that the County had a "special policy" regarding methadone facilities and that a special hearing would have to be held to determine if WMI qualified as a community care center. Compl. ¶ 53. The department did not inform Mr. Smith that WMI might be able to qualify as a medical office or medical clinic. *Id.* ¶ 58.

Mr. Smith requested a written copy of the County's "special" methadone policy, but none was forthcoming. *Id.* ¶ 53. Indeed, the County's zoning regulations contain no such policy. In fact, the zoning regulations contain no provisions whatsoever specifically defining and addressing drug treatment programs of any type. The zoning regulations clearly provide, however, that the Zoning Commissioner is authorized to conduct hearings "as shall, in his discretion, be necessary for the proper enforcement of all zoning regulations, subject to the right of appeal to the County Board of Appeals ...." B.C.Z.R. § 500.7. Apparently pursuant to this authority, the County requires proposed drug treatment programs that offer me-

---

4. "The deputy zoning commissioner shall assist the zoning commissioner in the performance of the duties conferred upon him in this title ...." Balto. County Code § 26–3(c).

thadone therapy—as opposed to counseling alone—"to undergo public hearing to determine category of use and/or to obtain special exception as a community care center." Def.'s Motion, p. 17; *see also* Def.'s Reply, Ex. 2 (affidavit of Carl Richards, Permits Department Zoning Supervisor). The asserted rationale for this policy is that "[t]he introduction of methadone ... create[s] uncertainty as to which category [i.e., 'medical office' or 'community care center'] the operation fits." Def.'s Motion, p. 15. In addition, the County contends that there are "unique risks associated with methadone dispensation," in particular, the problem of methadone diversion. *Id.,* pp. 17–19, Ex. 7 (federal DEA report discussing diversion problem). In contrast to its "special policy" for methadone clinics, the County admits that it routinely classifies non-methadone drug treatment facilities as "medical offices" and permits them to operate *as of right* in B.R. zones *without undergoing a public hearing. See, e.g.,* Def.'s Reply, pp. 12–13.[5]

After being denied a use permit by the Permits Department, on April 22, 1997, WMI, through its counsel, filed a petition for a special exception under the "community care center" classification. Compl. ¶ 61. In order to satisfy the requirements for a "community care center," WMI entered into an agreement with Pregnancy AID Centers, Inc., a non-profit organization that provides a variety of services to pregnant, drug-addicted women, to have that organization "sponsor" WMI's methadone treatment program. *Id.* ¶ 60.[6] The

mandatory hearing on WMI's special exception petition, *see* B.C.Z.R. § 500.5, originally was scheduled for June 2, 1997. Compl. ¶ 61. The hearing was postponed, however, at the request of citizens who opposed WMI's plans to operate a methadone clinic at the Pulaski Highway location. Compl. ¶ 62. WMI's counsel consented to the postponement. Def.'s Reply, Ex. 6 (affidavit of Timothy M. Kotroco, Baltimore County Deputy Zoning Commissioner).

## C. Baltimore County Opposition to Methadone Programs:

Plaintiff contends that a "firestorm of opposition erupted" when local residents, civic organizations, and politicians learned about WMI's plans to locate its methadone treatment facility in the White Marsh area. Compl. ¶ 63. Furthermore, WMI asserts that this opposition was motivated by "bias and animus toward the clients who would be served." *Id.* While the evidence submitted by WMI in support of this assertion is not as inflammatory or discriminatory as WMI suggests, *see* Pl.'s Opposition, Ex. 6 (collected letters), most of the letters express opposition to the facility as being not in "the best interest of the community." Other letters express concerns about declining property values and lack of adequate police protection; still others suggest that Franklin Square Hospital would be a more appropriate location for the facility; and one letter questions the philosophy and cost-effectiveness of methadone treatment programs in general.[7]

5. The County's admission thus contradicts the position taken by the Baltimore County Attorney in an August 1997 letter to the Maryland Department of Health and Mental Hygiene, in which she stated that it is "standard" procedure to require a special zoning hearing for any proposed medical facility in order to determine whether it qualifies as a medical office or community care center, and that this requirement "do[es] not apply solely to methadone clinics." Pl.'s Opposition, Ex. 5.

6. Recall that under the County's zoning regulations, the designation "community care center" only applies to treatment facilities that are "sponsored or operated by a private char-

itable organization or by a public agency." B.C.Z.R. § 101. For-profit treatment facilities are excluded from this particular use classification. Although WMI is sponsored by a private charitable organization, it also claims to be a for-profit business. *See* Compl. ¶ 57; Pl.'s Opposition, p. 6. Plaintiff has not taken a clear position on whether it does or does not meet the definition of "community care center."

7. One of the letters relied on by WMI was written by a Maryland State Delegate to the owner of the property leased by WMI. In the letter, the Delegate states that WMI's plans to operate a methadone treatment program on

Hoping to relieve the community's concerns about their proposed facility, in early June 1997 Mr. Smith and Mr. Berch convened a community meeting in a local church. Compl. ¶ 65. According to the Complaint, more than fifty residents and elected officials, including a representative of Baltimore County Councilman Vince Gardina, attended the meeting. *Id.* WMI claims that the attendees "expressed their strong opposition to WMI, based on their bias and animus toward the individuals who would be served" and that the "language and views expressed by some were so offensive that, at one point, the minister of the church reminded the audience that they were in a house of God." *Id.*

The fact that numerous local residents who attended the meeting told Mr. Smith and Mr. Berch that they objected to WMI's proposed methadone treatment facility, regardless of the basis for their opposition, does not necessarily demonstrate that *the County's* ultimate decision to deny WMI a use permit for the Pulaski Highway property was discriminatory. On the other hand, the fact that Councilman Gardina's representative also publicly expressed the Councilman's opposition to the facility, Compl. ¶ 66, is relevant, because as a member of the County Council, Councilman Gardina exercises some meaningful measure of power and influence over the County's zoning process. *See, e.g.,* Balto. County Charter § 522. Nonetheless, Plaintiff has submitted no evidence showing that Councilman Gardina's opposition to WMI's proposed location was motivated by bias towards drug-addicted individuals [8] or that the Councilman is unalterably opposed to the siting of any new methadone treatment facilities in Baltimore County.

Following the community meeting, WMI's counsel began inquiring into whether WMI could occupy the Pulaski Highway property "as of right" as either a "medical office" or "medical clinic." Compl. ¶ 70. Pursuant to the County's "special" methadone policy, the Permits Department informed him that a special hearing would be necessary to determine whether WMI qualified under either of the two classifications. *Id.* ¶ 71. Accordingly, on July 8, 1997, WMI's zoning petition was amended to add a request for a special hearing to determine whether WMI qualified for a use permit as of right under either the "medical office" or "medical clinic" classification. *See* Def.'s Reply, Ex. 5 (letter from WMI's counsel to Baltimore County Zoning Office). The combined hearing on WMI's request to be granted a use permit as of right as a "medical office" or "medi-

---

the property have "caused a great deal of concern among the residents" in the area. She further states that she must "echo their concerns." She then writes:

> In dealing with proposals for methadone centers in other areas of my district, I have learned that there is very little control of where possible patients come from. In fact I have been told that many patients come from other states such as Delaware for treatment. *Once they arrive at the center for their treatment they can linger and loiter for any length of time, and possibly get into mischief.*

(Emphasis added.) The Delegate goes on to suggest that "such treatment centers would be better located near medical facilities such as Franklin Square Hospital." She concludes her letter by "strongly urg[ing] [the property owner] to reconsider the proposed treatment center, and lease the store front to a more appropriate usage."

Assuming, *arguendo,* that Plaintiff is correct in characterizing the Delegate's letter as reflecting "stereotypical and misinformed attitudes," Compl. ¶ 64, the court nonetheless notes that the Delegate who wrote the letter was not involved in any way in the decision-making process being challenged here by WMI. This case concerns Baltimore County's zoning procedures, which Plaintiff alleges were discriminatorily applied to deny it a use permit for its proposed methadone treatment program. There is no evidence that the Delegate, in her capacity as a state-level legislative official, exercised any power or influence over these procedures. Second, the recipient of the letter, the owner of the property leased by WMI, also was not involved in any way in the County's decision to deny WMI a use permit.

8. Indeed, according to the Complaint, Councilman Gardina initially supported WMI's plans to locate on Pulaski Highway. Compl. ¶ 49.

cal clinic" as well as its earlier request for a special exception as a "community care center" was scheduled for September 9, 1997. Compl. ¶ 73.

Before WMI's hearing took place, a number of other relevant events occurred. First, on July 7, 1997, the Baltimore County Council passed Resolution No. 78–97, requesting the Baltimore County Planning Board

> to consider proposing amendments to the Baltimore County Zoning Regulations in order to define methadone clinics and drug treatment centers, to specify the zone or zones in which such clinics or centers might be permitted, and to establish standards for the location, design and operation of methadone clinics and drug treatment centers in Baltimore County.

Def.'s Motion, Ex. 3.[9] The Council believed that such amendments were necessary due to the current regulations' lack of definitions for "methadone clinic" and "drug treatment center" and the resulting ambiguity in how methadone and non-methadone treatment centers should be classified for zoning purposes. As the Council pointed out, "certain types of drug treatment centers may fall within the classification of medical clinics or community care centers under the Zoning Regulations." *Id.*[10] One undesirable consequence of this

ambiguity, in the Council's view, is that drug treatment centers, including methadone clinics, may be permitted to operate in locations that are "inappropriately close to surrounding residential communities." *Id.* To date, however, no zoning amendments intended to resolve these perceived deficiencies have been proposed by the Planning Board or acted upon by the County Council. Pl.'s Opposition, pp. 9–10.

On July 8, 1997, Baltimore County Executive C.A. Dutch Ruppersberger, III, sent a letter to Martin P. Wasserman, the Secretary of the Maryland Department of Health and Mental Hygiene ("Department of Health"), notifying him of Resolution No. 78–97 and "respectfully request[ing]" that no permits for methadone clinics be issued in Baltimore County until the Planning Board has proposed and the County Council recommends any changes to [the County's] zoning regulations pertaining to drug methadone clinics and drug treatment centers." Pl.'s Opposition, Ex. 7.[11] Mr. Ruppersberger's "hope" was that the Department of Health would impose a "moratorium on the issuance of permits for methadone clinics." *Id.*[12]

It does not appear that such a "moratorium" was ever imposed by the State Department of Health. Plaintiff alleges that Secretary Wasserman agreed during a

---

9. The Planning Board consists of fifteen members, eight of whom are appointed by the Baltimore County Executive; the remaining seven members are appointed by the seven-member County Council, with each councilperson appointing one Board member, who must reside in the councilperson's district. Balto. County Charter § 522. The Planning Board assists the Baltimore County Office of Planning and Zoning with, *inter alia*, "[p]reparing and recommending to the county council zoning rules and regulations ...." *Id.* § 522.1; *see also* Balto. County Code § 26–33 (providing for referral of zoning matters to Planning Board by County Council).

10. This is precisely the situation here: WMI appears to meet the definitions of both "medical office" and "community care center," but these two use classifications are mutually exclusive. As explained earlier, while a "medi-

cal office" is permitted as of right in a B.R. zone, a "community care center" is permitted only with a special exception. *See* B.C.Z.R. § 230.

11. A similar letter was sent to Secretary Wasserman by Councilman Gardina on July 1, 1997, prior to the passage of the resolution. *See* Pl.'s Surreply, Att. A.

12. Plaintiff mischaracterizes Mr. Ruppersberger's letter when it suggests that the letter shows that *the County* had imposed a "moratorium on the siting of all methadone treatment programs" in Baltimore County. *See* Pl.'s Opposition, p. 8; *see also* Compl. ¶¶ 81–82. The letter clearly is referring to the State's certification process for proposed methadone treatment programs, not the County's permitting process.

July 21, 1997 meeting with Baltimore County officials "to suspend approval of all such applications until this process was completed." *See* Pl.'s Opposition, Ex. 8 (August 1997 letter from County Executive Ruppersberger to Secretary Wasserman). Nevertheless, there is no evidence that the "moratorium" was actually enforced or that the state certification process was in fact suspended. *See id.* (indicating that proposed methadone treatment programs continued to be certified by State despite Secretary's pledge). Furthermore, WMI has not alleged that it was denied state certification as a result of this "moratorium." Indeed, according to WMI's petition for a special hearing, it has been certified by "at least two (2) state licensing agencies." Def.'s Motion, Ex. 4. Thus, any failure to be afforded the necessary state certification is not an issue in this case independent of the denial of County zoning approval.

What is at issue in this case is the County's failure to grant Plaintiff a use permit for WMI's proposed methadone treatment facility. Relevant to this issue is Mr. Ruppersberger's response upon learning that the State was continuing to certify methadone programs. In an August 8, 1997 letter to Secretary Wasserman, Mr. Ruppersberger reiterated his desire that the Department of Health suspend the state certification process until the County had completed its review of its zoning regulations. Pl.'s Opposition, Ex. 8. Significantly, he further informed the Secretary that

> *Baltimore County will resist, in the strongest of ways, the approval of these and any other centers* where we have not had the opportunity for thorough review and evaluation of existing zoning regulations, which will properly define where the centers should be located.

*Id.* (referring in part to WMI) (emphasis added). This letter undoubtedly demonstrates the strength of Mr. Ruppersberger's opposition to methadone treatment programs locating in Baltimore County.

Another piece of evidence that is relevant to the County's allegedly unlawful refusal to issue WMI a use permit is the State Department of Health's so-called "consultation/approval" policy. The policy was instituted in 1993 when, in response to political pressure exerted by Baltimore County officials, Nelson J. Sabatini, the then-Secretary of the State Department of Health, assured Roger B. Hayden, County Executive Ruppersberger's predecessor, that he (Sabatini) would "not authorize the operation of *any* methadone program without consulting with and receiving the approval of the appropriate local county government officials." Pl.'s Opposition, Ex. 3 (letter dated March 1, 1993) (emphasis in original); Compl. ¶ 27. The "consultation/approval" policy is administered by the State Methadone Authority. Compl. ¶ 50. Defendants do not dispute Plaintiff's claim that no other state-licensed medical facility is subject to a similar procedure before locating in Baltimore County. Compl. ¶ 29.

On June 30, 1997, County Executive Ruppersberger sent a letter to Secretary Wasserman "requesting that [Secretary Wasserman] renew Mr. Sabatini's pledge to include local government *at the time application is made to the State Health Department,* so that everyone impacted by [proposed methadone] facilities may be given a chance to review the need and appropriateness of these programs." Pl.'s Opposition, Ex. 3 (emphasis in original). Mr. Ruppersberger's letter was written in response to information he had received indicating that the "consultation/approval" policy was not being followed by the state agencies involved in certifying three proposed methadone treatment programs in Baltimore County. *Id.* (the identity of the programs was not mentioned in the letter). After "requesting" that Secretary Wasserman reinstate the policy,[13] Mr. Ruppers-

---

**13.** Nothing in the record shows whether Secretary Wasserman ever specifically agreed to

berger advised the Secretary that "notification should be directed to Dr. Michelle Leverett, who will then involve my office." *Id.; see also* Compl. ¶ 46 (identifying Dr. Leverett as the County's "contact person" for the "consultation/approval" procedure).

Accepting Plaintiff's contention that the Department of Health's "consultation/approval" policy was in force and was applied to WMI's application for state certification, Plaintiff nevertheless has neither alleged nor offered evidence to show that it was denied the necessary state certification as a result of the policy. In fact, the allegations contained in the Complaint reveal that Dr. Leverett, when contacted by both Plaintiff and the State Methadone Authority, *approved* WMI's proposed methadone treatment program. *See* Compl. ¶¶ 46–48, 50. Thus, while the existence of the policy may be evidence of the County's resistance to methadone clinics, nothing in the record supports a finding that Dr. Leverett or any other Baltimore County official directly "vetoed" or otherwise interfered with WMI's state certification pursuant to the "consultation/approval" policy.

One final piece of evidence that is relevant to the County's allegedly unlawful refusal to issue WMI a use permit is the position taken by Michael Gimbel, the Director of Baltimore County's Bureau of Substance Abuse, who allegedly opposes private, for-profit methadone clinics. Compl. ¶ 23. Mr. Gimbel, commonly referred to as Baltimore County's "drug czar," has publicly opined that private methadone treatment is a form of "legalized drug dealing" and has stated that the existing Timonium facility fully serves the need for methadone treatment in Baltimore County. Pl.'s Opposition, Ex. 2, Att. F.

#### D. WMI's Zoning Hearing:

Relying on all of the above-described evidence of the County's alleged discriminatory animus towards drug-addicted individuals, Plaintiff contends that "the County had already decided [WMI's] case several months before the September 9, 1997 zoning hearing." Pl.'s Opposition, p. 10. Essentially, Plaintiff argues that Resolution No. 78–97, the Ruppersberger letters, and the other expressions of official opposition to methadone treatment programs in Baltimore County, were known to Deputy Zoning Commissioner Timothy Kotroco before he presided over WMI's zoning hearing in September 1997 and that this knowledge "biased or tainted" his decision in the case. *See* Pl.'s Surreply, pp. 3–5.[14] In response, Commissioner Kotroco maintains that at the time of the hearing, he was not aware that the County Council had passed the resolution. *See* Amended Affidavit of Timothy Kotroco, ¶ 5. Furthermore, although he admits that he knew that County Executive Ruppersberger had corresponded with the State Department of Health regarding methadone clinics, he insists that he "did not read the letter" before rendering his decision and that he "gave the letter no weight." *Id.* ¶ 6.

At WMI's hearing before Commissioner Kotroco, the issues were (1) whether, under the applicable zoning regulations, WMI qualified as a "medical office" or "medical clinic," entitling it to a use permit as of right, or whether it constituted a "community care center," requiring it to obtain a "special exception" before operating at the Pulaski Highway location, and (2) whether, if found to constitute a community care center, WMI should be issued

Mr. Ruppersberger's request.

**14.** The Baltimore County Zoning Commissioner and deputy zoning commissioners are appointed by the county executive, subject to confirmation by the county council. They may be removed at any time upon the recommendation of the county executive with the approval of a majority plus one of the total number of county council members. Balto. County Charter § 522. The deputy zoning commissioners assist the Zoning Commissioner in the performance of his duties, which primarily consist of presiding over "quasi-judicial" zoning hearings. *See* Balto. County Code § 26–3; B.C.Z.R. § 500.

the requested special exception. *See* Def.'s Motion, Ex. 4 (Deputy Zoning Commissioner Kotroco's opinion), pp. 1, 6.

Regarding the first issue, Mr. Smith testified that WMI was a private operation, sponsored by a charitable organization (Pregnancy AID Centers, Inc.), and that it would not receive public funding. He further testified that the primary purpose of WMI would be to treat drug-dependent individuals through the use of methadone. The facility would be staffed by a physician, a psychologist, and various counselors, all of whom would participate in each patient's treatment. Mr. Smith anticipated treating a total of 120–150 patients at the facility, with approximately 15–20 patients seen each day. The dispensing of methadone would take place six days a week between the hours of 6:00 a.m. (7:00 a.m. on Saturdays) and 10:00 a.m. The methadone and all other drugs and medications used at the facility would be stored in a safe and approved manner. WMI's patients would be subjected to random drug tests to ensure their compliance with the program. *Id.*, pp. 2–4.

Based on this evidence, and after "closely reviewing" the relevant definitions set forth in the County's zoning regulations, Commissioner Kotroco concluded that WMI "more closely fits the definition of a community care center" than the definition of either a "medical office" or "medical clinic." To support this conclusion, he stated only that, in his view, the definitions of "medical office" and "medical clinic" are "basically general." In contrast, the definition of "community care center" expressly refers to the "counseling, supervision, or rehabilitation of alcoholics, or drug abusers." Consequently, Commissioner Kotroco denied WMI's request "to approve the subject use as a medical office or medical clinic." *Id.*, p. 7. Commissioner Kotroco

then turned to the second issue: whether to grant WMI a "special exception."

Numerous residents and local public officials testified in opposition to Plaintiff's proposed facility.[15] Commissioner Kotroco's opinion plainly acknowledges that the facility's opponents were "mainly concerned about the type of individual who would be seeking methadone treatment" at WMI. Although they expressed other reasons for opposing the facility, the opponents feared that the program's clients "would wander elsewhere into their communities and commit crime." *Id.*, p. 5. Testifying in support of WMI were Mr. Smith; Dr. Burton D'Lugoff, a professor of medicine at the Johns Hopkins University School of Medicine and an expert in the field of methadone treatment; and William Monk, an expert consultant in land planning and zoning. *Id.*, p. 4.

After hearing all of the testimony for and against the facility, Commissioner Kotroco decided not to grant WMI a special exception to operate at the Pulaski Highway location, on the grounds that "a community care center on the subject site would impact the surrounding communities disproportionately than if the use were located elsewhere within the same B.R. zone in Baltimore County." *Id.*, p. 8.[16] Commissioner Kotroco's decision was based on the following findings and considerations: First, the Commissioner found that there was a "substantial[ ]" "lack of police presence in this particular area" due to the proposed site's "unique" location at the "outermost boundary of two police precincts." *Id.*, pp. 7–8. Second, in the Commissioner's opinion, the location lacked "the structured environment … necessary in order for this type of use to safely operate." *Id.*, p. 8. The Commissioner indicated that he believed a "hospital cam-

---

**15.** Nothing in the record indicates that any Baltimore County officials testified against WMI's petition.

**16.** Commissioner Kotroco did acknowledge that methadone "is an effective drug used to

treat the effects of withdrawal associated with individuals who are rehabilitating themselves from either a heroin addiction or prescription drug addiction." Def.'s Motion, Ex. 4, p. 3.

pus" would be a more appropriate site for the facility because such locations are regularly patrolled by surveillance cameras and security guards and there are employees or other personnel present essentially around the clock. In contrast, at the Pulaski Highway location, the Commissioner found that, in addition to the reduced police presence, "most, if not all, of the offices will close after normal business hours." As a result, the Commissioner was particularly concerned about the possibility of loitering and burglary at the proposed facility. *Id.* Accordingly, WMI's request for a special exception was denied.

Plaintiff did not appeal Commissioner Kotroco's decision to either the Baltimore County Board of Appeals or the state circuit court for Baltimore County.

### E. WMI's Lawsuit:

The present lawsuit was filed on June 8, 1998. Plaintiff claims that Defendants' actions in denying WMI a use permit for the Pulaski Highway property violated Plaintiff's rights under the Americans With Disabilities Act of 1990 ("ADA"), codified at 42 U.S.C. § 12101 *et seq.,* and the Due Process Clause of the Fourteenth Amendment. Specifically, Plaintiff contends that its rights under Title II of the ADA, 42 U.S.C. § 12132, and Title IV of the ADA, 42 U.S.C. § 12203(b), were infringed by the following actions allegedly taken by Defendants: (1) imposing the "consultation/approval" policy for state certification and requiring WMI to provide notice of and obtain pre-approval for its proposed location; (2) imposing a "moratorium" on the siting of all methadone treatment programs in Baltimore County and securing the State's commitment to adhere to this "moratorium"; (3) requiring WMI to attend a special hearing in order to determine its rights to a zoning permit as a "medical office" or "community care center"; and (4) denying WMI a use permit for the Pulaski Highway property. *See* Compl. ¶¶ 107, 110; Pl.'s Opposition, p. 13. Plaintiff also contends that its right to procedural due process under the Four-

teenth Amendment, enforced through 42 U.S.C. § 1983, was violated when WMI was required by Defendants "to engage in a sham hearing process" in which the outcome was decided "prior to the presentation of any evidence" by a biased decisionmaker. *See* Compl. ¶ 115; *see also* Pl.'s Opposition, pp. 39–41. Plaintiff seeks declaratory and injunctive relief, as well as monetary damages and costs.

### STANDARD OF REVIEW

The Fourth Circuit recently summarized the basic principles governing the resolution of Rule 12(b)(6) motions:

> The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint; "importantly, [a Rule 12(b)(6) motion] does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party v. Martin,* 980 F.2d 943, 952 (4th Cir.1992). Accordingly, a Rule 12(b)(6) motion should only be granted if, after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief. *See id.* . . . . We do note, however, that for purposes of Rule 12(b)(6), we are not required to accept as true the legal conclusions set forth in a plaintiff's complaint. *See District 28, United Mine Workers of Am., Inc. v. Wellmore Coal Corp.,* 609 F.2d 1083,1085 (4th Cir.1979).

*Edwards v. City of Goldsboro,* 178 F.3d 231, 243–44 (4th Cir.1999). Where matters outside the pleadings are considered by the court, a defendant's motion to dismiss will be treated as one for summary judgment under Rule 56. *See* Fed.R.Civ.P. 12(b).

Rule 56(c) of the Federal Rules of Civil Procedure provides that:

> [Summary judgment] shall be rendered forthwith if the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

A genuine issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir.1994). In making this determination, the evidence of the party opposing summary judgment is to be believed and all justifiable inferences drawn in her favor. *Halperin v. Abacus Tech. Corp.,* 128 F.3d 191, 196 (4th Cir.1997) (citing *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505). The non-moving party may not rest upon mere allegations or denials in her pleading, however, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *Allstate Fin. Corp. v. Financorp, Inc.,* 934 F.2d 55, 58 (4th Cir.1991). The "mere existence of a scintilla of evidence in support of the plaintiff's position" is not enough to defeat a defendant's summary judgment motion. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505.

## *ANALYSIS*

### I. ADA Claim

■ When Congress passed the landmark Americans With Disabilities Act in 1990, its purpose was "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Among the types of discrimination that Congress was most concerned with were "outright intentional exclusion" and "exclusionary qualification standards and criteria." *Id.* § 12101(a)(5). Congress's stated goal in eliminating these and other forms of discrimination against disabled individuals was "to assure equality of opportunity, full participation, independent living, and economic self-sufficien-

cy for such individuals." *Id.* § 12101(a)(8). As a remedial statute, the ADA "should be broadly construed to effectuate its purposes." *Arnold v. United Parcel Serv., Inc.,* 136 F.3d 854, 861 (1st Cir.1998) (quoting *Tcherepnin v. Knight,* 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967)); *see also Kornblau v. Dade County,* 86 F.3d 193, 194 (11th Cir.1996) ("the Act must be broadly construed").

Plaintiff contends that in denying it a zoning permit, Defendants violated Title II and Title IV of the ADA. Turning first to the Title II claim, Title II of the ADA prohibits state and local governments from discriminating against individuals based on their disabilities. It reads, in relevant part:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. The term "public entity" is defined by the ADA as any state or local government, including "any department, agency, special purpose district, or other instrumentality" of a state or local government. *Id.* § 12131(1). The term "qualified individual with a disability" is defined, in relevant part, as

> an individual with a disability who, with or without reasonable modifications to rules, policies, or practices ... meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

*Id.* § 12131(2).

Significantly, Defendants do not dispute that WMI's anticipated clientele—individuals with opiate addiction who require methadone therapy to aid in their recovery—are disabled individuals covered by the ADA. *See, e.g., Shafer v. Preston Mem'l Hosp. Corp.,* 107 F.3d 274, 279–80 (4th Cir.1997) ("persons who have refrained

from using drugs for some time are protected under the statute"); *Innovative Health Sys., Inc. v. City of White Plains,* 931 F.Supp. 222, 231 (S.D.N.Y.1996) ("Persons recovering from or receiving treatment for addiction to alcohol or drugs are disabled individuals for purposes of the ADA"), *aff'd in part,* 117 F.3d 37 (2d Cir. 1997).[17]

Nor do Defendants challenge WMI's standing under the ADA to sue the County on its clients' behalf. *See, e.g., Innovative Health Sys.,* 117 F.3d at 47–48 (drug-addiction treatment center has standing under Title II of ADA); *Discovery House, Inc. v. Consolidated City of Indianapolis,* 1999 WL 199113, at *8–9 (N.D.Ind. April 1, 1999) (same); *Oak Ridge Care Center, Inc. v. Racine County,* 896 F.Supp. 867, 871–72 (E.D.Wis.1995) (same).

■ Furthermore, Defendants do not dispute that Title II applies to the County's zoning decisions. *See, e.g., Bay Area Addiction Research and Treatment, Inc. v. City of Antioch,* 179 F.3d 725, 1999 WL 351126, at *5 (9th Cir. June 3, 1999) (holding that ADA applies to local zoning deci-

sions); *Innovative Health Sys.,* 117 F.3d at 44–45 (same); *Discovery House,* 1999 WL 199113 at *4–5 (same); *Oak Ridge Care Center,* 896 F.Supp. at 872–73 (same).[18]

■ Preliminarily, Defendants assert a variety of immunity and "capacity to be sued" defenses. *See* Def.'s Motion, pp. 8–12; Def.'s Reply, pp. 3–9. First, as to the immunity defenses, it is axiomatic that these are individual in nature and do not apply to either local governments or their agencies. *See, e.g., Burtnick v. McLean,* 76 F.3d 611, 613 (4th Cir.1996) (involving legislative immunity); *Discovery House,* 1999 WL 199113, at *7 (involving judicial immunity); *Knussman v. Maryland,* 16 F.Supp.2d 601, 615 (D.Md.1998) (involving qualified immunity). Since Plaintiff is not bringing its ADA claims against the four defendants named in their individual capacities, but only against the four governmental defendants, *see* Pl.'s Opposition, p. 16, the immunity defenses raised by Defendants simply do not apply.

Defendants next contend that Baltimore County is the only governmental defen-

17. In *Doe v. University of Maryland Med. Sys. Corp.,* 50 F.3d 1261, 1265–66 (4th Cir.1995), the Fourth Circuit explained that "an individual is not otherwise qualified [and therefore is not protected by the ADA] if he poses a significant risk to the health or safety of others by virtue of the disability that cannot be eliminated by reasonable accommodation." *See also Bay Area Addiction Research and Treatment, Inc. v. City of Antioch,* 179 F.3d 725, 734 (9th Cir.1999) ("an individual who poses a significant risk to the health or safety of others that cannot be ameliorated by means of a reasonable modification is not a qualified individual under § 12131"). This "significant risk test" is not applicable here, however, since Defendants do not contend that WMI's clients fall outside the class of persons protected by the ADA. Moreover, there is no evidence in the record supporting a finding that WMI's proposed methadone clinic poses a significant risk to the health or safety of Baltimore County residents that cannot be eliminated by reasonable accommodation. At the very least, whether the clinic posed such a risk would be a dispute of material fact precluding summary judgment.

18. As part of their argument that the four individual defendants—County Executive Ruppersberger, County Council Chairman Bartenfelder, Permits Department Director Jablon, and Deputy Zoning Commissioner Kotroco—are entitled to qualified immunity under the ADA, Defendants contend that as of 1997, it was not clearly established law either that WMI had standing to sue under Title II or that Title II applied to local zoning decisions. Def.'s Motion, pp. 9–12; *see, e.g., Kessler Inst. for Rehabilitation, Inc. v. Borough of Essex Fells,* 876 F.Supp. 641, 652, 655 (D.N.J. 1995) (health care facility for disabled persons lacked standing under Title II; local zoning decision is not public service, program, or activity within meaning of Title II). Defendants nowhere assert, however, that Plaintiff in fact lacks standing under the ADA or that the ADA does not apply to the zoning decision Plaintiff is challenging. In any event, based on the reasoning found in the cases cited above, the court is satisfied that Plaintiff indeed possesses constitutional and prudential standing to bring suit against the County under the ADA and that the ADA applies to the zoning decision at issue in this case.

dant that "is a juridical entity and subject to suit." Def.'s Motion, p. 12. More specifically, Defendants argue that although § 12131 (defining "public entity") "brings the *actions* of [local government] agencies and departments within the scope of the Act," it "does not necessarily make them [*i.e.*, the agencies and departments] amenable to suit." Def.'s Reply, p. 8 (emphasis in original). Relying on Fed.R.Civ.P. 17(b), which provides that the capacity of an entity to sue or be sued "shall be determined by the law of the state in which the district court is held," Defendants claim that under Maryland law only the County itself, and not the County's offices and departments, is authorized to sue and be sued. Def.'s Reply, p. 8. Consequently, Defendants assert that "all entities Plaintiff has sued other than Baltimore County should be dismissed from its ADA claims." *Id.*, p. 9; *see, e.g., Darby v. Pasadena Police Dep't,* 939 F.2d 311, 313–14 (5th Cir.1991) (finding that plaintiff improperly filed Title VII suit against police department but not against city, on grounds that department lacked separate legal existence under Texas law, but reversing district court's decision not to permit plaintiff to amend complaint ). The court disagrees.

■ As Defendants acknowledge, § 12131 extends Title II's prohibition on discrimination against disabled individuals to "any department, agency, special purpose district, or other instrumentality" of a state or local government. The court believes that it was Congress's intent to provide a cause of action against any public entity that falls within this definition. Nothing in the language of Title II indicates that a disabled person who has been discriminated against by an agency of a

state or local government is precluded from directly suing the offending agency. Indeed, the caselaw contains multiple examples of this very situation. *See, e.g., Davis v. Francis Howell Sch. Dist.,* 138 F.3d 754 (8th Cir.1998) (defendants included local school district); *Innovative Health Sys., Inc. v. City of White Plains,* 117 F.3d 37 (2d Cir.1997) (defendants included city zoning and planning boards); *Discovery House, Inc. v. Consolidated City of Indianapolis,* 1999 WL 199113 (N.D.Ind.1999) (defendants included city zoning board); *Roe v. County Comm'n,* 926 F.Supp. 74 (N.D.W.Va.1996) (defendants included county sheriff's department).[19]

■ Defendants' interpretation of Title II's reach is inconsistent with its strong and comprehensive mandate against discrimination on the basis of disability by providers of public services. Unlike, for example, 42 U.S.C. § 1983, which does incorporate capacity distinctions for purposes of determining the class of "persons" to which the statute applies, nothing about the language or goals of Title II suggests that Congress similarly intended to limit the class of defendants to which Title II applies. Moreover, as a federal statute enacted pursuant to Congress's authority under the Fourteenth Amendment, *see* 42 U.S.C. § 12101(b)(4); *Amos v. Maryland Dep't of Pub. Safety and Correctional Servs.,* 178 F.3d 212, 222–23 (4th Cir.1999) ("Congress acted within its constitutionally granted powers when it enacted the ADA ... pursuant to § 5 of the Fourteenth Amendment"), the provisions of the ADA take precedence over conflicting state laws. *See Howlett v. Rose,* 496 U.S. 356, 375, 110 S.Ct. 2430, 110 L.Ed.2d 332 (1990) ("The elements of, and the defenses to, a

**19.** In contrast, the Fifth Circuit's decision in *Darby v. Pasadena Police Dep't,* cited above, is an isolated Title VII decision that has not been followed outside of the Fifth Circuit. To the extent that *Darby* is relevant, however, it merely stands for the proposition that the plaintiff in that case was required to name the city as a defendant along with the police department, not that the police department

had to be dismissed from the case. *See* 939 F.2d at 313 (plaintiff's suit "can[not] proceed against the police department alone"); *id.* ("a political subdivision cannot pursue a suit on its own"). In this case, Plaintiff has satisfied *Darby's* requirements by naming Baltimore County as a defendant along with the three other governmental defendants.

federal cause of action are defined by federal law") (holding that federal law determines who is a "person" under § 1983). Accordingly, the court will not dismiss Plaintiff's ADA claims against the County Council, the Permits Department, or the Office of Zoning Commissioner on these grounds.

■ In order to establish disability discrimination in violation of Title II of the ADA, a plaintiff must prove "(1) that he has a disability; (2) that he is otherwise qualified for the employment or benefit in question; and (3) that he was excluded from the employment or benefit due to discrimination solely on the basis of the disability." *Doe v. University of Maryland Med. Sys. Corp.*, 50 F.3d 1261, 1265 (4th Cir.1995). Since it is undisputed that Plaintiff's clients are disabled and are otherwise qualified for the zoning permit in question, the central question in this litigation is whether Defendants' actions in refusing to grant the zoning permit constitute unlawful discrimination "solely on the basis of the disability."

■ Although Title II broadly prohibits discrimination on the basis of disability by public entities, *see* 42 U.S.C. § 12132 ("no qualified individual with a disability shall, by reason of such disability ... be subjected to discrimination by any such entity"), it provides very little guidance by way of defining exactly what constitutes "discrimination" within the meaning of the statute. *Compare* 42 U.S.C. § 12112 (setting forth numerous definitions of disability discrimination in employment matters covered under Title I of the ADA). Consequently, the court will look to Title II's implementing regulations promulgated by the Department of Justice in accordance with the Act. *See id.* § 12134. The Justice Department's views are entitled to substantial deference. *See Marcus v. Kansas Dep't of Revenue*, 170 F.3d 1305, 1307 n. 1 (10th Cir.1999); *Kornblau*, 86 F.3d at 194 ("considerable weight"); *Helen L. v. DiDario*, 46 F.3d 325, 331 (3d Cir.1995) ("substantial deference"); *see also Olmstead v. L.C.,* ——

U.S. ——, ——, 119 S.Ct. 2176, 2186, 144 L.Ed.2d 540 (1999) ("the well-reasoned views of the agencies implementing a statute constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance") (internal quotation marks and citations omitted).

Under the regulations, a public entity, "in providing any aid, benefit, or service may not ... [a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others" or "[o]therwise limit [such an individual] in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service." 28 C.F.R. § 35.130(b)(1)(ii), (vii). Furthermore, the regulations prohibit a public entity from "utiliz[ing] criteria or methods of administration ... [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability." *Id.* § 35.130(b)(3)(i). This provision applies to written policies as well as actual practices and is intended to prohibit both "blatantly exclusionary policies or practices" and "policies and practices that are neutral on their face, but deny individuals with disabilities an effective opportunity to participate." *Id.*, Pt. 35, App. A. Similarly, a public entity

> shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or *any class of individuals with disabilities* from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity.

*Id.* § 35.130(b)(8) (emphasis added). Finally, the regulations require that a public entity

> shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid

discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

*Id.* § 35.130(b)(7).

 Thus, as interpreted by the Justice Department, Title II prohibits not only intentional discrimination against disabled individuals, but also any policies or practices that have a disparate impact on disabled individuals. *See Crowder v. Kitagawa,* 81 F.3d 1480, 1483 (9th Cir.1996) ("Congress intended to prohibit outright discrimination, as well as those forms of discrimination which deny disabled persons public services disproportionately due to their disability"). In addition, where a public entity's policies, practices, or procedures discriminate against disabled individuals in violation of the ADA, Title II imposes an affirmative obligation on the part of the public entity to make "reasonable modifications" thereto unless such modifications "would fundamentally alter the nature of the service, program or activity" in question. *See id.* at 1485.

 In this case, Defendants do not deny that they treat proposed methadone clinics differently from other drug treatment facilities when deciding whether to issue zoning permits. Pursuant to the County's unwritten, "special" methadone policy, the County requires proposed methadone clinics, such as WMI, to undergo a public hearing and to qualify as "community care centers" before being permitted to operate in B.R. zones. In contrast, non-methadone drug treatment facilities are permitted to operate in B.R. zones as of right (under the "medical office" classification) and no public hearing is required. Def.'s Motion, p. 15.

Nevertheless, Defendants contend that the County's special methadone policy does not discriminate against disabled persons because it is based on "the unique risks associated with methadone dispensation, and not [on the facility's] association

with disabled persons[,] as the zoning treatment of non-methadone dispensing treatment facilities shows." *Id.,* p. 15; *see also* Def's Reply, p. 13 ("Logically, then, the distinction between a counseling office treating for substance abuse and a methadone treatment facility treating for substance abuse is not the client, but the method of treatment"). Furthermore, the County argues that it has a "rational basis" for treating methadone clinics differently. Def.'s Motion, p. 16. Finally, the County argues that there was nothing discriminatory about either requiring WMI to attend a public hearing or denying WMI's request for a special exception.

Plaintiff's argument in opposition is straightforward: Since "[t]he dispensing of methadone cannot be divorced from the individuals who take the medication," the County's special methadone policy "discriminate[s] against those patients whose addiction requires methadone for effective treatment." Pl.'s Opposition, pp. 28–29. The court agrees.

 The County's special methadone policy unquestionably imposes disproportionate burdens on a particular class of disabled individuals: opiate addicts who require methadone therapy to aid in their recovery. *See* 28 C.F.R. § 35.130(b)(8) (prohibiting public entities from employing eligibility criteria for public benefits that "tend to screen out ... any class of individuals with disabilities from fully and equally enjoying" the benefit). The fact that the County may have a "rational basis" for this policy, standing alone, is not sufficient to justify this burden. *See Oconomowoc Residential Programs, Inc. v. City of Greenfield,* 23 F.Supp.2d 941, 953 (E.D.Wis.1998) (explaining that ADA "accorded disabled people the status of a protected class" and consequently, "[a] rational basis will no longer support a law which burdens the disabled"). Only if this burden cannot be eliminated through "reasonable modifications" in the County's zoning process would it not run afoul of the

ADA.[20] *See* 28 C.F.R. § 35.130(b)(7); *Trovato v. City of Manchester*, 992 F.Supp. 493, 498–99 (D.N.H.1997) (granting summary judgment to plaintiffs where city "failed to reasonably accommodate plaintiffs' disability" by refusing to exempt plaintiffs from zoning ordinance's setback requirements which prohibited plaintiffs from constructing front-yard parking space).

Moreover, if carried to its logical conclusion, the County's argument justifies a blanket ban on methadone treatment programs operating in Baltimore County. The court believes, however, that such a ban would be contrary to the ADA's non-discrimination mandate, as it would significantly burden the ability of Baltimore County residents who are disabled due to their addiction to heroin and other narcotics to receive a clinically-proven and governmentally-approved form of treatment. *Compare Crowder*, 81 F.3d at 1484 (holding that Hawaii's animal quarantine law discriminated against visually-impaired persons in violation of the ADA by restricting access to guide dogs needed to use public services).

While the ADA certainly does not prohibit the County from adopting appropriate zoning regulations governing the location of methadone treatment facilities, the court believes that the ADA prohibits the County from enforcing its zoning regulations in a manner that effectively precludes proposed methadone treatment programs from operating in the county or that otherwise imposes unreasonable burdens on such programs. The court, of course, is mindful of the deference that federal courts historically have paid to municipal zoning decisions. *See Gardner v. City of Baltimore*, 969 F.2d 63, 67–68 (4th Cir. 1992). Nevertheless, federal antidiscrimination statutes must take precedence over conflicting local laws and practices. *See Crowder*, 81 F.3d at 1485 ("when Congress has passed antidiscrimination laws such as the ADA which require reasonable modifications to public health and safety policies, it is incumbent upon the courts to insure that the mandate of federal law is achieved").

██ Accordingly, the court will deny Defendants' motion as to Plaintiff's ADA Title II claim.[21] The court cannot say as a matter of law that Defendants have not

**20.** Defendants point out that Plaintiff "did not seek a reasonable accommodation or otherwise invoke [the] ADA at anytime during the zoning procedure." Def's Reply, p. 10. Assuming, *arguendo*, that Plaintiff was required to do so, *cf. Bledsoe v. Palm Beach County Soil and Water Conserv. Dist.*, 133 F.3d 816, 824 (11th Cir.1998) (Title II contains no administrative exhaustion requirement); *Jeremy H. v. Mount Lebanon Sch. Dist.*, 95 F.3d 272, 281–82 (3d Cir.1996) (same), the court believes that Plaintiff met its burden by requesting a special exception to operate as a community care center. *See Oconomowoc Residential Programs*, 23 F.Supp.2d at 955. The County's zoning regulations authorize the zoning commissioner, when granting special exceptions, to "impose such conditions, restrictions or regulations as may be deemed necessary or advisable for the protection of surrounding and neighboring properties." B.C.Z.R. § 502.2. In this case, rather than denying WMI's application outright, Commissioner Kotroco could have granted the special exception on the condition that WMI meet certain reasonable re-

quirements designed to alleviate the commissioner's concerns about community safety.

**21.** The court will deny without prejudice Defendants' motion as to Plaintiff's ADA Title IV claim brought pursuant to 42 U.S.C. § 12203(b), which provides:

It shall be unlawful to ... interfere with any individual in the exercise or enjoyment of ... or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

By its very terms, the protection afforded by § 12203(b) is limited to "individuals," and WMI does not constitute an "individual" within the ordinary meaning of the word. This issue was first raised by the court *sua sponte* at the hearing, however, and Plaintiff has since submitted some evidence concerning the legislative history of the provision that may be relevant. In any event, the remedies available under Title IV are duplicative of the remedies available under Title II. *See id.* § 12203(c).

discriminated against WMI's clients on the basis of its clients' disability. First, a genuine issue of material fact remains regarding whether the burdens imposed on disabled individuals by the County's special methadone policy can be eliminated through reasonable modifications in the County's zoning procedures. These burdens involve (1) subjecting proposed methadone clinics to a special zoning hearing and (2) requiring proposed methadone clinics to qualify as "community care centers" before permitting them to operate in Baltimore County.

■ Second, with regards to the special zoning hearing, the court agrees with Defendants that "[a] public hearing requirement does not of itself establish an actionable violation of the ADA." Def.'s Motion, p. 16 (citing *Oxford House v. City of Virginia Beach*, 825 F.Supp. 1251 (E.D.Va.1993)). In *Oxford House*, however, the hearing requirement was imposed equally on all parties, regardless of disability, who sought to exceed the city's four-person limit on the number of unrelated persons who could live together in the same house. 825 F.Supp. at 1254. In that case, the operators of a group home for recovering alcohol and drug abusers refused to apply for a conditional use permit before bringing suit under the ADA and other federal statutes challenging the city's residential occupancy limits. The district court held that the plaintiffs' claims of discrimination were premature "until requests for conditional use permits are made and acted upon by the City." *Id.* To the extent that the plaintiffs were asserting that they were exempt from applying for a conditional use permit, which would have required them to undergo a public hearing, the court dismissed their claims. *Id.*

■ The district court's decision in *Oxford House* stands for the uncontroversial proposition that under the ADA, disabled individuals are entitled to no greater rights than non-disabled individuals. *See Kornblau*, 86 F.3d at 194 ("The purpose of the Act is to place those with disabilities on an equal footing, not to give them an unfair advantage"). In this case, however, the County imposed a public hearing requirement on WMI, a proposed methadone clinic, that it does not impose on other types of proposed drug treatment facilities, or on medical facilities serving the general population. Furthermore, whereas the County classifies non-methadone drug treatment facilities as "medical offices" and permits them to operate in B.R. zones as of right, methadone clinics like WMI must obtain special exceptions as "community care centers" before being permitted to operate in the same zones. By challenging these requirements under the ADA, WMI is not seeking an "unfair advantage." Rather, WMI merely demands to be placed on a "equal footing." It will be up to the County at trial to show whether these requirements are necessary to the County's zoning scheme, *see* 28 C.F.R. § 35.130(b)(8), and cannot be eliminated by any reasonable modifications thereto, *see id.* § 35.130(b)(7).

■ Another genuine issue of material fact remains concerning whether the County is enforcing its zoning regulations in such a way as effectively to preclude WMI and other proposed methadone programs from locating in the county. The court finds that Plaintiff has presented sufficient evidence to reach a jury on this question. This evidence includes, first, the various official expressions of opposition to methadone treatment programs that are attributable to County Executive Ruppersberger and County "drug czar" Gimbel. As "the chief executive officer of the county and the official head of the county government," Mr. Ruppersberger exercises considerable power and influence over Baltimore County's government. *See generally* Balto. County Charter § 402. Not only is he responsible for ensuring that all of the County's officers, employees, offices, and departments faithfully perform their duties, he either directly or through his administrative officer appoints all of the

officials involved in administering the County's zoning regulations, including the Permits Department Director and the Deputy Zoning Commissioner. In light of Mr. Ruppersberger's prominent role in the County's government, a reasonable jury could conclude that his views represent the County's official position regarding methadone treatment facilities. This conclusion is only strengthened by Mr. Gimbel's own public pronouncements opposing such facilities.

Another piece of evidence supporting a finding that the County is enforcing its zoning regulations in a manner calculated to prevent the location of any new methadone treatment programs in the county is the special methadone policy itself. To begin with, the policy is unwritten and has never been formally approved by the one body authorized by the County Charter to exercise lawmaking powers, the County Council. *See* Balto. County Charter § 306; *see also id.* § 522.1(b) (providing that amendments to County's zoning regulations "shall, prior to taking effect as law, be approved by legislative act of the county council"). Moreover, the asserted rationale for the policy is unpersuasive. The County argues that, while it routinely classifies non-methadone treatment programs as "medical offices," there is "uncertainty" as to whether drug treatment programs that dispense methadone constitute "medical offices" or "community care centers." Def.'s Motion, p. 15. Yet, nothing in the definition of either classification refers to methadone or to any other drug. *See* B.C.Z.R. § 101. Although the court acknowledges that WMI appears to fit both definitions, so do drug treatment programs that do not dispense methadone. Whatever "uncertainty" exists, therefore, has nothing to do with the "introduction of methadone," *see* Def.'s Motion, p. 15, but rather is a result of the generality of the two definitions and the lack of any zoning regulations specifically addressing methadone clinics. Based on the existing zoning regulations, Defendants simply have not articulated a persuasive reason for classi-

fying methadone treatment programs differently from non-methadone treatment programs. Presented with this evidence, the court finds that a reasonable jury could conclude that the County's special methadone policy is a pretext for subjecting methadone clinics to the more rigorous requirements for obtaining "special exceptions" as "community care centers" in order to enable the County to deny them zoning approval without appearing to discriminate on the basis of disability.

Instructive on this issue is the Second Circuit's decision in *Innovative Health Sys. v. City of White Plains,* 117 F.3d 37 (2d Cir.1997). In that case, an outpatient drug and alcohol rehabilitation center sought to relocate to a facility in downtown White Plains, New York. The issue was whether the center constituted a "business or professional office," which was permitted in the zoning district, or a "clinic," which was not. Although initially both the building commissioner and the city's corporate counsel approved the center's application for a building permit as an "office," on appeal the zoning board of appeals ruled that the center constituted an impermissible "clinic," and it overturned the commissioner's decision to issue a building permit to the center. 117 F.3d at 41–42.

The center then filed suit in federal district court alleging, *inter alia,* that the board's actions violated Title II of the ADA. After the district court granted the center's request for a preliminary injunction, the case was appealed to the Second Circuit, which affirmed. *Id.* at 49. In doing so, one of the main factors the circuit court considered was the "lack of a credible justification" for the board's decision to classify the center as a "clinic" rather than an "office." *Id.* The court found that the board's decision was "highly suspect in light of the requirements set forth in the zoning ordinance," which supported the conclusion that the center was an office and not a clinic. *Id.* The court further pointed out that not only did the

board fail to explain why the center constituted a clinic, it also failed to explain why other similar uses in the same district constituted offices. *Id.* The court concluded that these inconsistencies in the board's decision raised an inference that "the decision was based on impermissible factors, namely the chemical-dependent status of [the center's] clients." *Id.*

Similarly, the County's failure in this case to offer a credible reason why methadone clinics constitute "community care centers," while non-methadone clinics constitute "medical offices," raises an inference that the County's treatment of proposed methadone clinics is motivated by unlawful bias against opiate-dependent individuals.

■ Finally, the court cannot entirely discount the local community's intense opposition to WMI. As Commissioner Kotroco acknowledged in his decision denying WMI a zoning permit, the people who testified at the hearing in opposition to WMI's petition were "mainly concerned about the *type of individual* who would be seeking methadone treatment" at the facility. Def.'s Motion, Ex. 4, p. 5 (emphasis added). While ordinarily "a decisionmaker is not to be saddled with every prejudice and misapprehension of the people he or she serves and represents[,] ... a decisionmaker has a duty not to allow illegal prejudices of the majority to influence the decisionmaking process." *Association of Relatives and Friends of AIDS Patients v. Regulations and Permits Admin.,* 740 F.Supp. 95, 104 (D.P.R.1990). Furthermore, "if an official act is performed simply in order to appease the discriminatory viewpoints of private parties, that act itself becomes tainted with discriminatory intent even if the decisionmaker personally has no strong views on the matter." *Id.; see also Innovative Health Sys.,* 117 F.3d at 49. Even if Plaintiff cannot prove that

Commissioner Kotroco denied WMI's zoning petition simply "to appease the discriminatory viewpoints of private parties," the above evidence will be relevant to the jury's determination as to whether the County adopted its special methadone policy in response to the local community's unlawful concerns about the "type of individuals" who require methadone therapy.[22]

## II. Procedural Due Process Claim

■ Turning next to the procedural due process claim, Plaintiff alleges in its Complaint that Defendants, "acting under color of state law," have "deprived WMI of property without due process of law" in violation of the Fourteenth Amendment. Compl. ¶ 115. Defendants argue in opposition that Plaintiff has failed to state a legally cognizable due process claim because the Fourteenth Amendment does not create a private cause of action. Def.'s Motion, pp. 7, 14. *See, e.g., Turpin v. Mailet,* 591 F.2d 426, 427 (2d Cir.1979) (en banc) (per curiam) ("there is no place for a cause of action against a municipality directly under the 14th Amendment"); *Cale v. City of Covington,* 586 F.2d 311, 313 (4th Cir.1978) (same). Rather, claims for damages against a municipality asserted under the Fourteenth Amendment must be brought pursuant to 42 U.S.C. § 1983. *See City of Covington, supra.* The first mention of § 1983 by Plaintiff occurs in its memorandum in opposition to Defendants' motion to dismiss. Defendants argue that Plaintiff was required specifically to identify § 1983 in the Complaint. Def.'s Reply, p. 3. The court disagrees.

■ A complaint generally is sufficient so long as it includes "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), and provides "adequate notice" to the defendant regarding the essential elements of the plaintiff's claim. *See United*

---

**22.** The court declines to resolve Defendants' motion concerning the availability of compensatory and punitive damages under Title II of the ADA. *See* Def.'s Motion, pp. 19–20. De-

fendants' motion will be denied without prejudice and may be raised again at an appropriate time later in these proceedings.

*States v. Potemken,* 841 F.2d 97, 102 (4th Cir.1988) (finding that government's complaint in tax lien foreclosure case provided adequate notice to defendant, even though statutory provision sued under was not explicitly referred to); *see also Leatherman v. Tarrant County Narcotics Unit,* 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) (rejecting "heightened pleading standard" in § 1983 cases against municipalities).

■ Here, Plaintiff alleged in its Complaint that Defendants, "acting under color of state law," deprived Plaintiff of its rights under the Fourteenth Amendment. The court finds that this allegation, in conjunction with the other factual and legal allegations contained in the Complaint, was sufficient to put Defendants on notice that Plaintiff was bringing a claim against them under § 1983. Moreover, Defendants obviously understood this to be the case. Nevertheless, although Plaintiff has stated a claim for relief under § 1983, the court will grant Defendants' motion for summary judgment as to Plaintiff's procedural due process claim.

42 U.S.C. § 1983 provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ....

Plaintiff alleges that the Defendants, "acting under color of state law," violated Plaintiff's right to procedural due process guaranteed by the Fourteenth Amendment.[23] Plaintiff brings its due process claim, pursuant to § 1983, against all eight defendants, the four individual defendants as well as the four governmental defendants. Pl.'s Opposition, pp. 16–17. The first question that must be resolved is whether each of these defendants constitutes a "person" within the meaning of the statute.

■ Defendants, of course, do not deny that the four defendants named in their individual capacities—County Executive Ruppersberger, County Council Chairman Bartenfelder, Permits Department Director Jablon, and Deputy Zoning Commissioner Kotroco—are "persons" who may be held liable under § 1983. *See* Def.'s Motion, pp. 8–10. They contend, however, that each individual defendant is immune from liability on various grounds (discussed below). *Id.* Furthermore, they rightfully acknowledge that Baltimore County is amenable to suit under the statute. *Id.,* p. 7; *see, e.g., Smallwood v. Jefferson County,* 753 F.Supp. 657 (W.D.Ky.1991) (finding that Kentucky county was "person" under § 1983). Unlike the individual defendants, Baltimore County can assert no immunity defense under § 1983. *See Berkley v. City of Charleston,* 63 F.3d 295, 296 (4th Cir.1995) (en banc) ("municipalities and local governments are not entitled to immunity from suits brought under section 1983").

■ A somewhat closer question is whether the remaining governmental defendants—the County Council, the Permits Department, and the Office of Zoning Commissioner—are "persons" within the meaning of § 1983. The court concludes that they are not. *See, e.g., Umhey v. County of Orange,* 957 F.Supp. 525, 531–32 (S.D.N.Y.1997) (finding that county ethics board is not "separate legal entity" capable of being sued under § 1983); *Vance v. County of Santa Clara,* 928 F.Supp. 993, 996 (N.D.Cal.1996) ("the term 'persons' does not encompass municipal departments") (finding that county corrections

---

**23.** The Fourteenth Amendment to the United States Constitution provides, in pertinent part: "No State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

department was not "person" under § 1983); *Post v. City of Fort Lauderdale,* 750 F.Supp. 1131, 1133 (S.D.Fla.1990) (finding that neither city police department nor city zoning department was "person" under § 1983). Consequently, Plaintiff cannot maintain a § 1983 action against these last three defendants.

The next question to be addressed is whether the four individual defendants are immune from liability for their alleged roles in denying Plaintiff a zoning permit.[24] Defendants argue that County Council Chairman Bartenfelder is absolutely immune from liability under the doctrine of legislative immunity; that Deputy Zoning Commissioner Kotroco is similarly shielded by the doctrine of judicial immunity; and that County Executive Ruppersberger and Permits Department Director Jablon are entitled to qualified immunity.

Immunity questions ordinarily should be resolved as a "threshold matter" before moving on to other issues. *See Torcasio v. Murray,* 57 F.3d 1340, 1352 (4th Cir.1995) (involving qualified immunity). "In many cases where a defendant has asserted qualified immunity, [however,] dismissal or even an award of summary judgment may be obviously warranted, based upon existing law, without the court ever ruling on the qualified immunity question." *DiMeglio v. Haines,* 45 F.3d 790, 799 (4th Cir.1995). This reasoning applies equally well to cases involving legislative or judicial immunity questions. Since the court finds that Plaintiff's procedural due process claim should be dismissed, it is unnecessary to resolve the Defendants' personal immunity claims.

In order to prevail on its procedural due process claim, Plaintiff must establish that (1) it had property or a property interest (2) of which Baltimore

County deprived it (3) without due process of law. *Sylvia Dev. Corp. v. Calvert County,* 48 F.3d 810, 826 (4th Cir.1995). The Fourteenth Amendment itself does not create property interests; rather, they are created and defined by some independent source, such as state law. *See Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Gardner v. City of Baltimore,* 969 F.2d 63, 68 (4th Cir.1992).[25] To have a property interest in a local zoning permit,

> a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.

*Roth,* 408 U.S. at 577, 92 S.Ct. 2701 (quoted in *Gardner,* 969 F.2d at 68). Whether a person possesses a legitimate claim of entitlement to a local zoning permit depends upon whether, under applicable state and local law, the issuing department "lacks all discretion to deny issuance of the permit or to withhold its approval. Any significant discretion conferred upon the local agency defeats the claim of a property interest." *Gardner,* 969 F.2d at 68.

Applying this standard, the Fourth Circuit repeatedly has rejected Fourteenth Amendment due process claims brought against local governments under § 1983 for refusing to issue zoning permits. *See, e.g., Sylvia Dev. Corp.,* 48 F.3d at 826 (no right to special zoning designation authorizing residential subdivision on agricultural land); *Biser v. Town of Bel Air,* 991 F.2d 100, 104 (4th Cir.1993) (no right to special zoning exception authorizing commercial office buildings in residential area); *Gardner,* 969 F.2d at 69–70 (no right to public works agreement authorizing residential subdivision); *compare Scott v. Greenville County,* 716 F.2d 1409, 1418

---

**24.** The only claim against the four individual defendants is the § 1983 due process claim. Pl.'s Opposition, p. 16.

**25.** Title II of the ADA cannot reasonably be read to grant WMI a property right in a zoning permit for the Pulaski Highway property. *See Kornblau,* 86 F.3d at 194 (Title II of ADA does not entitle disabled driver, who is not county employee, to park in handicapped parking space in county employees' parking lot).

(4th Cir.1983) (plaintiff entitled to building permit "upon presentation of an application and plans showing a use expressly permitted under the then-current zoning ordinance").

In light of the above line of cases, it is perhaps not surprising that Plaintiff does *not* claim an entitlement to the zoning permit at issue in this case. Instead, the property interests of which Plaintiff alleges the County deprived it without due process of law are (1) the lease to the Pulaski Highway property and (2) "the hearing that defendants required it to participate in." Pl.'s Opposition, p. 40. Neither of these asserted "interests," however, supports Plaintiff's claim under the Due Process Clause.

First, there simply is no evidence that the County "deprived" Plaintiff of the Pulaski Highway lease. Plaintiff freely entered into the lease prior to submitting its petition for a zoning permit, and then just as freely forfeited the lease following Commissioner Kotroco's decision to deny the petition. *See* Compl. ¶¶ 51, 92. The only sense in which the County "deprived" Plaintiff of the lease is illustrated by Plaintiff's claim that "WMI was forced to forfeit its lease at the Pulaski Highway site because it could not obtain the necessary zoning approval." *Id.* ¶ 92.[26] Thus, the real issue behind this argument is the denial of the zoning permit. But Plaintiff nowhere asserts an entitlement to the zoning permit. Consequently, this argument must fail.

Second, Plaintiff undoubtedly received a hearing on its zoning petition. *Compare Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 429–33, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982) (plaintiff denied procedural due process where state fair employment commission failed to convene statutorily mandated hearing on plaintiff's discrimination charge). Plaintiff contends, however, that the hearing was not fair because Commis-

sioner Kotroco was biased against it; as a result, "the outcome of the matter had been decided before the hearing was even held." Pl.'s Opposition, p. 41.

Unquestionably, "[a]n impartial decisionmaker is an essential element of due process." *Morris v. City of Danville,* 744 F.2d 1041, 1044 (4th Cir.1984) (citing *Goldberg v. Kelly,* 397 U.S. 254, 271, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970)). Significantly, however, "[a]dministrative decisionmakers, like judicial ones, are entitled to a 'presumption of honesty and integrity.'" *Morris,* 744 F.2d at 1044 (quoting *Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975)). Furthermore, "absent a showing of bias stemming from an 'extrajudicial source,' they are not constitutionally precluded from making the determination that they are directed to make by their employer." *Morris,* 744 F.2d at 1044 (citing *Bowens v. North Carolina Dep't of Human Resources,* 710 F.2d 1015, 1020 (4th Cir. 1983)).

In this case, Plaintiff has presented no evidence that Commissioner Kotroco was unconstitutionally biased against WMI's petition for a zoning permit. The mere fact that Commissioner Kotroco may have been aware that other county officials opposed the siting of methadone treatment clinics in Baltimore County in no way proves that Commissioner Kotroco himself was also opposed to such clinics. Moreover, in the absence of any direct extrajudicial evidence of Commissioner Kotroco's own bias, the inferences and innuendos urged by Plaintiff, *see, e.g.,* Pl.'s Opposition, p. 41 (suggesting that Commissioner Kotroco, as a political appointee of County Executive Ruppersberger, may have been concerned about his "job security" in the event that he ruled contrary to County Executive Ruppersberger's wishes), are simply not sufficient to over-

---

**26.** This claim is unsupported by evidence demonstrating that the leased property could not have been used or sublet profitably by WMI for purposes other than the proposed methadone clinic.

come the presumption of honesty and integrity accorded administrative decision-makers. Consequently, the court rejects Plaintiff's suggestion that "at a minimum" a dispute of material fact exists as to Commissioner Kotroco's actual or apparent bias in this matter.

Accordingly, Plaintiff's procedural due process claim must fail, and summary judgment will be granted to Defendants.[27]

A separate Order follows.

## ORDER

For the reasons stated in the accompanying Memorandum, it is hereby **ORDERED** that:

1. Defendants' motion to dismiss Plaintiff's cause of action under Title II of the ADA (Count I) will be **Denied**;

2. Defendants' motion to dismiss Plaintiff's cause of action under Title IV of the ADA (Count II) will be **Denied without prejudice**;

3. Defendants' motion to dismiss Plaintiff's cause of action under the Due Process Clause of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983 (Count III) will be **Granted**;

4. Defendants' motion seeking to strike Plaintiff's claims for compensatory and punitive damages under Title II of the ADA will be **Denied without prejudice**; and

5. Copies of this Order and the accompanying Memorandum shall be mailed to counsel of record.

---

**27.** It is unnecessary, therefore, for the court to decide whether the individual Defendants enjoy personal immunity, *see DiMeglio*, 45 F.3d at 799, or whether Plaintiff has demonstrated a basis for holding the County liable for the alleged due process violations, *see, e.g., Greensboro Prof'l Fire Fighters Ass'n v. City of Greensboro*, 64 F.3d 962 (4th Cir.1995) (explaining grounds for municipal liability under § 1983). Nor is it necessary for the court to respond to Defendants' suggestion that Plaintiff's due process claim is barred under the doctrine of *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), and its progeny. *See* Def.'s Motion, p. 14.