760 A.2d 677

**John P. MASTANDREA, et ux.**

**v.**

**John C. NORTH, II.**

**No. 119, Sept. Term, 1999.**

Court of Appeals of Maryland.

Oct. 10, 2000.

107, 112, 106 A.2d 488 (1954); *Furley v. Warren–Ehret Co.,* 195 Md. 339, 347–48, 73 A.2d 497 (1950).

108

110

David R. Thompson (Brynja M. Booth of Cowdrey, Thompson & Karsten, P.A., on brief), Easton, for appellants.

Marianne D. Mason, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Annapolis, for appellee.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL and HARRELL, JJ.

HARRELL, Judge.

We issued a writ of certiorari on our own initiative in this appeal,[1] before it was considered by the Court of Special Appeals, primarily to consider the question of whether Title II of the Americans With Disabilities Act (42 U.S.C. §§ 12131–12134) applies to the administration and enforcement of the Talbot County Zoning Ordinance (the Zoning Ordinance or Z.O.), and specifically its provisions governing variances for property within the Chesapeake Bay Critical Area lying within Talbot County. Because of a facet of the pertinent legislative history revealed only after we agreed to consider this case, we shall not answer this question; instead, we shall reverse, on a different ground, the judgment of the Circuit Court for Talbot County, which had reversed the grant of the variance at issue in this matter by the Board of Appeals of Talbot County (the Board). In so doing, we also conclude that the Board's grant of the variance was supported by substantial evidence on the record before the Board.

## I.

Dr. and Mrs. John P. Mastandrea (Appellants) purchased in December 1992 an approximately 12 acre undeveloped, but subdivided, lot with frontage on Glebe Creek in Talbot County. Over the next 4 years or so, the Mastandreas, for themselves and their family, constructed on the lot a home, swimming pool, tennis court, pier, garden, and an extensive set of pathways connecting these improvements. Included in the pathway system, installed personally in 1996 by Dr. Mastandrea and his three eldest sons, were a brick-in-cement path connecting the house and pier and a brick-in-sand path roughly parallel to and within 20–25 feet of the bulkheaded edge of Glebe Creek. A primary reason given for installing the extensive, connecting path system was that the Mastandreas' daughter, Leah, suffered from muscular dystrophy (a progressively degenerative neurological and muscular disease) and

---

1. *Mastandrea v. North,* 357 Md. 190, 742 A.2d 520 (1999).

was confined to a motorized wheelchair for mobility purposes. In order that she might access all of the property's amenities, and partake of them to some extent with her siblings, the pathways were designed to facilitate her movement by wheelchair. Much of the design and construction of the improvements on the lot also considered wheelchair access as an integral goal.

The Mastandreas installed the pathways without the benefit of a required building permit from Talbot County (or any form of prior governmental blessing or review) and heedless of the fact that a portion of the pathways were placed within the 100 foot buffer of the Chesapeake Bay Critical Area[2] adjacent to Glebe Creek. The brick-in-cement portion of that path within the Critical Area buffer comprised 711 square feet of surface area. The brick-in-sand portion covered 4486 square feet of the surface of the Critical Area buffer. Together, the surface areas of these two components of the overall path system represented 4% of the total Critical Area buffer identified on the lot. Discovery by the authorities of the unauthorized installation led, among other things, to the Mastandreas filing on 29 January 1998 a variance application with the Board in an effort to validate the pathways constructed within the Critical Area buffer.[3]

Zoning Ordinance § 19.12(b)(5)(iii)(b) defines the Critical Area buffer as being "at least 100 feet wide, measured landward from the Mean Highwater Line of tidal waters and tidal wetlands, and from tributary streams."[4] The need for a variance for those portions of the pathways located within 100

---

2. The State statutory background creating the Chesapeake Bay Critical Area regulatory scheme, which pre-existed the installation of the pathways in the present case, and how it is carried out through the land use regulatory schemes of local political subdivisions, is presented generally in *White v. North*, 356 Md. 31, 36–38, 736 A.2d 1072, 1075–76 (1999).

3. A special exception was also sought. The disposition of that application, however, is not at issue in the present matter.

4. The Mastandreas do not challenge that the pathways in this case are installed within the Critical Area buffer on their lot.

feet of the shore of Glebe Creek is necessitated by Z.O. § 19.12(b)(5)(iii)(c), which prohibits "[n]ew development activities, including structures, roads, parking areas and other impervious surfaces" in the buffer.[5]

At the time the Mastandreas filed their variance application, Z.O. § 19.14(b)(3)(iv) required the following favorable findings to be made by the Board before it could grant a variance from the Critical Area regulations:

(iv) In order to vary or modify the Talbot County Critical Area provisions of this Ordinance, the Board of Appeals must determine that the application meets all of the criteria set forth below.

[a] Special conditions or circumstances exist that are peculiar to the land or structure such that a literal enforcement of the provisions of this Ordinance would result in unwarranted hardship to the property owner;

[b] A literal interpretation of this Ordinance will deprive the property owner of rights commonly enjoyed by other property owners in the same zone;

[c] The granting of a variance will not confer upon the property owner any special privilege that would be denied by this Ordinance to other owners of lands or structures within the same zone;

[d] The variance request is not based on conditions or circumstances which are the result of actions by the property owner nor does the request arise from any condition relating to land or building use, either permitted or nonconforming, on any neighboring property;

[e] The granting of a variance within the Critical Area will not adversely affect water quality or adversely impact fish, wildlife, or plant habitat and the granting of the variance will be in harmony with the general spirit and

---

5. The Chesapeake Bay Critical Area Commission, the body that superintends compliance with the State regulatory scheme for the Critical Area, interprets the "impervious area" prohibition as including the types of pathway construction involved in the present case. The Mastandreas do not challenge that interpretation.

intent of the Critical Area Law, the Talbot County Critical Area Plan and the regulations adopted in this Ordinance;

[f] The variance shall not exceed the minimum adjustment necessary to relieve the unwarranted hardship; and

[g] The granting of the variance will not adversely affect water quality or adversely impact fish, wildlife or plant habitat, and the granting of the variance will be in harmony with the general spirit and intent of the Critical Area Law, the Talbot County Critical Area Program and the Critical Area provisions of this Ordinance.[6]

At the Board's 11 May 1998 hearing on the Mastandreas' application, the applicants, in support of their principal theme that the variance should be granted as a reasonable accommodation of Leah's disability so that she could access the pier and enjoy the shoreline of Glebe Creek, mustered both testimony and exhibits. They explained that the pathways were located to allow a wheelchair to get close enough that Leah could enjoy the waterfront, but not so close as to be dangerous. According to the Mastandreas, the natural slope and the soil composition of the lot near the shoreline (except for the direct pier access) did not permit wheelchair access directly to the waterfront. Placing the pathways outside the 100 foot buffer, however, would deny a wheelchair occupant access to

---

**6.** For the sake of comparison, Z.O. § 19.14(b)(3)(iii) required the following findings to be made before a variance could be granted with regard to property not implicating a Critical Area regulation:

[a] Certain unique physical characteristics exist, such as unusual size or shape of the property or extraordinary topographical conditions, such that a literal enforcement of the provisions of this Ordinance would result in practical difficulty or unreasonable hardship in enabling the applicant to develop the property;

[b] The granting of the variance is not based upon circumstances which are self-created or self-imposed;

[c] Greater profitability or lack of knowledge of the restrictions shall not be considered as sufficient cause for a variance;

[d] The granting of the variance will not be contrary to the public interest and will not be a determent to adjacent or neighboring properties; and

[e] The variance shall not exceed the minimum adjustment necessary to relieve the practical difficulty or unreasonable hardship.

and enjoyment of the waterfront, they contended. The pathways permitted Leah to enjoy the natural and recreational aspects of her family's waterfront lot and were the only means by which Leah could accompany her brothers and sisters on walks and other activities on the lot. Mrs. Mastandrea testified that her daughter's ability to have access to the waterfront is one of the few pleasures that she still is able to enjoy due to the physical effects of her disorder.

The (brick-in-concrete) pier access pathway was designed to prevent a wheelchair from gaining momentum on the natural downslope from the house to the water. A pathway constructed in a straight line from the house to the pier, without the slope break provided by the Mastandreas' construction, would create a dangerous situation for a person confined to a wheelchair.

Dr. Mastandrea testified that in constructing the brick-in-sand pathway parallel to Glebe Creek his sons removed about six inches of turf, surface soil, and clay, and replaced it with three to five inches of sand. An environmental consultant, Ronald Gatton,[7] testified that he was familiar with the Mastandreas' property and the intent of the Critical Area laws to reduce the amount of runoff into the Chesapeake Bay and its tributaries.[8] Mr. Gatton testified that the soil of the lot was one of the heaviest clay soils that he had ever tested. He

---

**7.** The surname of this witness was spelled "Gattol" in the transcript of the Board's hearing. We shall adopt the spelling "Gatton," as used in the parties' briefs.

**8.** Section 9–1808 of the Annotated Code of Maryland provides, in pertinent part:

*(b) Goals of Program.*—A [Critical Area] program shall consist of those elements which are necessary or appropriate:

(1) To minimize adverse impacts on water quality that result from pollutants that are discharged from structures or conveyances or that have run off from surrounding lands;

(2) To conserve fish, wildlife, and plant habitat; and

(3) To establish land use policies for development in the Chesapeake Bay Critical Area which accommodate growth and also address the fact that, even if pollution is controlled, the number, movement, and activities of persons in that area can create adverse environmental impacts.

conducted an infiltration test on the brick-in-sand path and determined that water permeated the brick-in-sand pathway faster than the surrounding undisturbed soil, making the path three times as permeable as the surrounding lawn. Mr. Gatton stated that because the natural soil conditions in the area tended to be very stiff, with a "plastic" quality, it was his opinion that the pathway parallel to the creek actually intercepts much of the runoff from the lawn between the house and the path before entering Glebe Creek.

Dr. Mastandrea explained that during the initial construction of the home he removed a number of trees, mainly from the shoreline, to allow bulkheading. Prior to bulkheading, the shoreline was eroding under the bordering trees. The Mastandreas replaced the removed trees and vegetation with approximately 100 eight-to-twelve foot trees and approximately 1000 three-foot seedlings planted throughout the lot. Overall, they installed approximately 2000 new plantings on the property.

The Critical Area Commission (the Commission) [9] presented one witness in opposition to the variance request. Mr. Gregory L. Schaner, a Natural Resources Planner for the Commission, opined that the requirements for granting a variance were not met by the Mastandreas. Mr. Schaner re-stated the position of the Commission, previously set forth in a 9 April 1998 letter to the Talbot County Planning Commission, that the Commission recommended denial of the variance request and that the Mastandreas be required to remove all portions of the pertinent pathways, except for an immediate perpendicular access from the house to the pier. As to the house-to-pier connection, Mr. Schaner recommended that the Board require that the Mastandreas remove all portions of the pathway, including the circular, wheelchair "break" areas de-

---

9. Appellee in this case, John C. North, II, is the Chair of the Commission. As such, he has standing, on behalf of the Commission, to initiate judicial review proceedings regarding local land use actions, such as the present one, where questions involving the enforcement of the Critical Area regulations are implicated. *See* Md.Code (1974, 1990 Repl.Vol., 1999 Suppl.), Natural Resources Art., § 8–1812(a).

signed to reduce a wheelchair's momentum on the way toward the pier, and suggested that the Board allow only a single, straight-line path from the house to the pier. He acknowledged that the Commission had not conducted any environmental impact studies or tests to ascertain the actual impact, if any, of the relevant pathways in the Critical Area buffer on the lot or the water quality of Glebe Creek. Mr. Schaner also acknowledged that there were, at that time, no provisions in the Critical Area regulations (State or county) or the Z.O. variance provisions expressly taking into account handicapped access considerations.

The Board, in split decisions rendered on 27 July 1998, voted to grant legitimizing variances for the existing pathway from the house to the pier (by a 4–1 vote) and for the existing pathway parallel to Glebe Creek (by a 3–2 vote). Essentially, the Board majority in each instance concluded that the paths provided reasonable access to the waterfront for handicapped persons and were reasonable accommodations for Leah's disability. The Board majority was impressed also with the mitigation effects of the Mastandreas' plantings and the permeability enhancement of the brick-in-sand pathway. Accordingly, the Board made written findings on 21 October 1998 favorable to the Mastandreas' application, as required by Z.O. § 19.14(b)(3)(iv).

The Commission (Appellee) timely sought judicial review of the Board's decision in the Circuit Court for Talbot County. The Mastandreas, in their memorandum of law supporting affirmance of the Board's decision, offered their now flagship legal argument that Title II of the federal Americans With Disabilities Act (ADA) not only applied to the Board's consideration of their variance application, but compelled its approval on the evidence before the Board. In essence, the Mastandreas argued that public entities, such as the Board, are required by the ADA to make reasonable modifications to their policies, practices, and procedures (such as the Z.O. provisions prohibiting new impervious surfaces within the Critical Area buffer), when necessary to avoid discrimination on the basis of a disability, unless it is shown that the

modifications sought would alter fundamentally the nature of the service, program, or activity.[10] Therefore, as Appellants' argument went, the Board's grant of the variance on the record before it, especially in light of the absence in the record of any contrary evidence that the variance would affirmatively harm the water quality of Glebe Creek or the Critical Area buffer on the lot, resulted in the reasonable accommodation of Leah's disability, as directed by the ADA and extant case law interpreting its application to land use regulations.[11]

Appellee's response to Appellants' ADA argument in the Circuit Court, delivered at oral argument on 4 June 1999, was

---

**10.** For this contention, the Mastandreas rely on 28 C.F.R. § 35.130(b)(7) (1999); *see infra* note 22 and accompanying text.

**11.** We note that the Mastandreas made scant mention of the ADA before the Board. In fact, they directed our attention to only the following reference made by their counsel in closing argument before the Board on 11 May 1998:

It is true that the Americans with Disabilities Act which requires that the public and public permitting agencies and that everybody involved with public matters make reasonable accommodations to the disabled and we all know about that. But it's very easy for the lawyers technically to say, oh, the Americans with Disabilities Act only applies to commercial ventures, to places of public accommodation. This is a private residence so don't dare accommodate the people that live there even if it has zero impact on the Bay which is the testimony before you tonight. No one's talked about the Federal Fair Housing Amendment and the Federal Fair Housing Law. It is an interesting law. It is a law that is designed in the housing field to do the same thing that the Americans with Disabilities Act does in places of public accommodation and to employers. And it says that it is unlawful to discriminate or to otherwise make unavailable or deny a dwelling to somebody because of handicap. For the purposes of this subsection, discrimination includes a refusal to permit at the expense of the handicapped person reasonable modifications of existing premises to be occupied by such person. A refusal to make reasonable accommodation in rules, policies, practices, service when such accommodations may be necessary to afford such person equal opportunity to use and enjoy the dwelling. And I submit to you that this is a law that if we test this at the next level or the level after that, there may well be a judge who says to you all that the County having a policy that it is prohibited from making a reasonable accommodation at a private residence like this, may be in violation of federal law. The Board, in its written decision, did not refer to or rely expressly on the ADA, or the Fair Housing Law, to justify or explain its approval of the variance.

that the ADA did not apply to the present case. The Commission asserted that the most that could be gleaned from the case law interpreting Title II was that "zoning authorities must make their decisions in a neutral manner, that is without regard to the disabilities of the applicant." The environmentally-justified, all-embracing prohibition against the development of new impervious surfaces within the Critical Area buffer was not a law that discriminated, argued the Commission's attorney. Moreover, as the argument continued, the ADA did not trump or compel the grant of variances in the present case merely because each resident of the house on the lot could not enjoy unfettered access to every part of the lot, i.e., "there is no ... fundamental right to lateral shoreline access on the part of anyone with private property.[12]"

By order dated 22 June 1999, the Circuit Court explained its judgment, in pertinent part, as follows:

Title II of the Americans With Disabilities Act (42 U.S.C. § 12132) has no application to this case, as the ADA only applies to places with public access, and the ADA does not apply to zoning ordinance enforcement;

The Respondents have failed to satisfy the variance factors required by the Talbot County Zoning Ordinance Section 19.14(b)(3) for the brick-in-sand parallel pathway; and

.The pathway from the home to the dock is permitted under the Talbot County Zoning Ordinance as a water dependent structure, and as such, no variance is required for this pathway.[13]

The Court ordered the removal of the brick-in-sand pathway in the Critical Area buffer parallel to Glebe Creek.

The Mastandreas appealed to the Court of Special Appeals. While that appeal was pending and shortly before we issued

---

12. The Commission was referring to the ADA, not riparian rights law, in making this assertion.

13. Appellee does not question the Circuit Court's ruling as to the house-to-pier pathway. Therefore, that aspect of the Circuit Court's judgment is not before us.

our writ of certiorari, the County Council for Talbot County enacted Bill No. 741 on 23 November 1999.[14] Bill 741, which became effective on 24 January 2000, repealed and re-enacted, with amendments, a hitherto ineffective provision of the Z.O. (§ 19.4(b)(7)), adopted originally on 9 March 1999 as Bill 701, which purported to require reasonable accommodations for the needs of disabled citizens in the consideration of, among other zoning actions, variances.[15] Bill No. 741 provided, in pertinent part, as follows:

A BILL TO REPEAL AND RE-ENACT SECTION 19.14(B)(7), TITLE 19, ZONING, OF THE TALBOT COUNTY CODE, WITH AMENDMENTS TO ALLOW THE BOARD OF APPEALS TO MAKE REASONABLE ACCOMMODATION FOR DISABLED CITIZENS, TO ESTABLISH CRITERIA FOR DOING SO, AND FOR LIMITING THE ENVIRONMENTAL IMPACT OF ANY SUCH ACCOMMODATION IN THE CRITICAL AREA. SECTION ONE: BE IT ENACTED by the County Council of Talbot County that Section 19.14(b)(7), Title 19, Zoning, of the Talbot County Code entitled "Reasonable Accommodation" shall be and is hereby repealed in its entirety and re-enacted as set forth herein.

(7) Reasonable Accommodation for the Needs of Disabled Citizens

---

**14.** We issued our writ of certiorari on 20 December 1999.

**15.** The substantive language of Z.O. § 19.14(b)(7), as adopted by Bill No. 701, was:

(i) Notwithstanding any other provisions of this Ordinance, and without regard to the standards for appeals, variances or special exceptions set forth elsewhere in this Zoning Ordinance, the Board of Appeals and other permitting authorities and officials shall make reasonable accommodations for the benefit of disabled citizens in the consideration of any building permit, administrative appeal, special exception, or variance.

Bill No. 701 did not become effective, however, because the Commission on or about 2 June 1999, pursuant to its authority under § 8–1809 of the Natural Resources Article of the Md.Code, refused to approve Bill No. 701 as an amendment to, or refinement of, Talbot County's Critical Area protection program as embodied in the zoning ordinance. *Id.* at § 8–1809(a)(1).

(i) Purpose. Notwithstanding any other provision of this Ordinance, the Board of Appeals may make reasonable accommodations for the benefit of disabled citizens in the consideration of any final order or decision of the Planning Officer or any administrative appeal, special exception or variance. Reasonable accommodation for the needs of disabled citizens may be permitted in accordance with the evidentiary requirements set forth in paragraph (ii) of this Section. Reasonable accommodations may only be approved following a review and recommendation by the Planning Commission, and final approval and authorization after a public hearing before the Board of Appeals.

(ii) An applicant/appellant shall have the burden of demonstrating by a preponderance of the evidence that:

[a] The existence of a disability within the meaning of the Americans with Disabilities Act;

[b] Literal enforcement of the statute, ordinance, regulation, or other requirement would (1) result in discrimination by virtue of such disability or (2) deprive the applicant/appellant of the reasonable use and enjoyment of the property;

[c] A reasonable accommodation would reduce or eliminate the discriminatory effect of the statute, ordinance, regulation, or other requirement or restore the applicant/appellant's reasonable use or enjoyment of the property;

[d] The accommodation requested will not substantially impair the purpose, intent, or effect of the statute, ordinance, regulation, or other requirement as applied to the property;

If the property is located in the Critical Area, the accommodation would:

[e] Be environmentally neutral with no greater negative impact on the environment than the literal enforcement of the statute, ordinance, regulation or other requirement; or

[f] Allow only the minimum environmental changes necessary to address the needs resulting from the particular disability of the applicant/appellant.

(iii) The Board of Appeals shall determine the nature and scope of any accommodation under this section and may award different or other relief than requested after giving due regard to:

[a] The purpose, intent, or effect of any applicable statute, regulation, or ordinance;

[b] The size, location, nature, and type of accommodation proposed and whether alternatives exist which accommodate the need with less adverse effect.

(iv) Upon termination of the need for any accommodation, the Board of Appeals may require, as a condition of approval, that the property be restored to comply with all applicable statutes, ordinances, regulations, or other requirements.

(v) Hearing Notice. Public notice of all applications and hearings shall be given in accordance with Section 19.14(h).

(vi) Site Visit. A majority of the members of the Board of Appeals shall be required to visit the site before conducting the public hearing. However, the decision shall be based upon the evidence of record.

(vii) Recommendation of the Planning Commission. Before making a decision on any application or appeal, the Board of Appeals shall obtain the recommendation of the Planning Commission. The Planning Commission's recommendation shall address the criteria in paragraph (ii) in this Section. The recommendation shall be considered by the Board of Appeals, shall become part of the record, but shall not be binding on the Board of Appeals. The Board may request from the Planning Commission such technical service, data, or factual information as may further assist the Board of Appeals in reaching a decision.

(viii) New application after denial. Following the denial of a request for a reasonable accommodation, no application for the same use on the same premises shall be filed within one (1) year from the date of denial, except on grounds of newly discovered evidence.

The Commission, in a letter to Talbot County, dated 7 January 2000, notified the County of its approval of Bill No. 741 as a "program refinement."

Our writ of certiorari was issued on the "strength" of Appellants' brief filed in the Court of Special Appeals on 3 December 1999. At the time of issuance of our writ on 20 December 1999, Appellee's brief was neither filed nor due in the intermediate appellate court. In Appellants' brief in the intermediate appellate court, no mention was made of the enactment on 23 November 1999 of Bill No. 741. In a footnote in that brief, passing mention was made of the enactment of Bill No. 701 and a copy of it was included in the companion record extract; however, it was noted that Bill No. 701 had been disapproved by the Commission. Accordingly, when the writ of certiorari was issued, we were unenlightened as to the enactment of Bill No. 741. Appellee's responsive brief filed later in this Court, and Appellants' subsequent reply brief, placed the legal effect of that enactment in play in this case.

## II.

### A.

As previously noted, the Mastandreas contend that the Circuit Court erred in concluding that Title II of the ADA is limited to places of public accommodation and does not apply to local land use regulatory actions.[16] They argue that the

---

16. The Commission, in its brief to this Court, essentially conceded that the Circuit Court, in its 22 June 1999 order, erred in these regards. The Commission stated that it

agrees that the trend of federal case law is that Title II of the ADA prohibits discrimination against disabled persons by a local govern-

ADA, and not Bill No. 741, governed the Board of Appeals's consideration of the variance request and what reasonable accommodations must be made in light of Leah's disability. The foundation of Appellants' argument is grounded on two assertions: (1) the ADA pre-empts local legislation on the same subject matter, and (2) the provisions of Bill No. 741, which grant the Board discretion to grant a variance in order to achieve a reasonable accommodation for a disabled person, conflict with provisions of the ADA, which mandate that the local governmental body make such accommodations under

---

ment in the government's activities, including zoning. Respondent submits that, while the lower court's reasoning on these issues may have been flawed, the court's statements about the ADA were not dispositive of the central issue before the circuit court—that is, the propriety of the Talbot County Board of Appeals's granting of a variance to the Critical Area Program. Even if the circuit court incorrectly interpreted the scope of the federal law, the lower court made the right decision on the record in this case.

Appellee's Brief at 17–18. Appellee's apparent concession may be well-founded. *See Bay Area Addiction Research & Treatment, Inc. v. City of Antioch,* 179 F.3d 725, 730 (9 th Cir.1999) (adopting the reasoning of the Second Circuit and holding that the ADA applies to local zoning decisions); *Innovative Health Systems, Inc. v. City of White Plains,* 117 F.3d 37, 44–46 (2d Cir.1997) (concluding that zoning is an "activity" of a public entity to which the ADA applies), *aff'g,* 931 F.Supp. 222 (S.D.N.Y.1996); *Smith–Berch, Inc. v. Baltimore County,* 68 F.Supp.2d 602, 621 (D.Md.1999) (applying the ADA to a zoning ordinance and finding that the county could not require a special hearing for the construction of a methadone clinic); *Dadian v. Village of Wilmette,* No. 98–C–3731, 1999 WL 299887, at *5 (N.D.Ill. May 4, 1999) (same); *Discovery House, Inc. v. Consolidated City of Indianapolis,* 43 F.Supp.2d 997, 1003 (N.D.Ind.1999) (refusing to dismiss the case on the argument that the Discovery House was not denied the benefit of an "activity" as defined by Title II of the ADA, for zoning is an "activity" under the ADA); *San Diego Unified Port District v. Gallagher,* 62 Cal.App.4th 501, 73 Cal.Rptr.2d 30, 31 (1998) (noting that an anchorage site evaluation, a type of zoning decision, is subject to the ADA); *Trovato v. City of Manchester, New Hampshire,* 992 F.Supp. 493, 497 (D.N.H.1997) (concluding that Title II of the ADA applied to zoning decisions ); *see also Oak Ridge Care Center, Inc. v. Racine County,* 896 F.Supp. 867, 873 (E.D.Wisc.1995) (determining that "[e]ven if zoning decisions are not an activity, a service, or a program, the [ADA's] catch-all phrase protects [individuals] from being subjected to discrimination by any such [governmental] entity"); *Pack v. Clayton County,* No. 1:93–CV–8365–RHH, 1993 WL 837007, at *8 (N.D.Ga.1993) (noting the ADA

the circumstances presented in this case. As a corollary to their second basis, Appellants suggest that the standards established in Bill No. 741 are impermissibly more strict than those in Title II of the ADA and the interpretative regulations of the Department of Justice.[17] Finally, the Mastandreas contend that Bill No. 741 is not applicable to the instant case, in the guise of a curative law, because, given the effect of the ADA on the pre-existing Z.O. requirements, no defect or omission existed in the ordinance at the time of the Board's decision that required curative legislation. Absent from Appellants' arguments directed at Bill No. 741 is any reliance on consideration of its retrospective application, e.g., *Arundel Corp. v. County Comm'rs of Carroll County,* 323 Md. 504, 594 A.2d 95 (1991).

Even though there was scant reference to the ADA in the record before the Board and no express reliance on the ADA in the Board's written findings of fact and conclusions of law granting the variance, it is clear that the Board considered and relied on Leah's disability in its application of the Critical Area variance standards in Z.O. § 19.14(b)(3)(iv). The Board's pertinent conclusions of law stated:

2. There are special conditions or circumstances which exist that are peculiar to the subject property such a literal enforcement of the provisions of the ordinance would result in unwarranted hardship to the property owner. The property is a large parcel with a substantial amount of waterfront. A walkway only to the pier on this property does not provide reasonable access to the entire waterfront area of the property if a walkway is the only means by which a resident can gain access to the waterfront. Part of the reasonable use of such a property is access to the entire

prohibits local governments from discriminating on the basis of disability in a zoning permit procedure), *aff'd,* 47 F.3d 430 (11th Cir.1995).

**17.** Appellants conversely assert that the ineffective Bill No. 701 would not have been pre-empted by, or in conflict with, the ADA because the provisions of Bill No. 701 were expressed as mandatory ("shall make reasonable accommodations for the benefit of disabled citizens in the consideration of any … variance").

waterfront, not just the pier. The lateral walkways within the buffer providing such access to a handicapped resident of the property amount to only about four percent of the entire surface area of the buffer, an amount which can easily be offset by mitigating plantings on the property and the Applicant appears to have already mitigated much of the potential increase in runoff from the lateral walkway by existing and planned landscaping. (The property was previously cultivated annually as farm property.)

3. A literal interpretation of the ordinance will deprive the property owner of rights commonly enjoyed by other property owners in the same zone. Access to the waterfront of the property for the Applicant's daughter is limited by her disability. Most people fortunate enough to live on waterfront property have access to the entire waterfront without having special walkways disturbing the buffer zone vegetation. The special circumstances of this resident will deprive her of that access commonly enjoyed by others.

4. The granting of the variance will not confer upon the property owner any special privilege that would be denied by the ordinance to other owners of lands or structures within the same zone. The walkways constructed by the Applicants are a reasonable accommodation for the special circumstances of the Applicants and should be granted to all owners of land in similar circumstances.

5. The variance request is not based on conditions or circumstances which are the result of actions by the property owner. By their actions, the Applicants purchased the property and placed the walkways where they are. However, they simply desire equal access to as much of the enjoyment of the property for their handicapped daughter as reasonably possible. The walkways are the least objectionable means to that end to accommodate her special circumstance which, of course, is not a result of their choice. The request does not arise from any condition relating to land or building use, either permitted or nonconforming, on any neighboring property.

6. The proposed variance will not adversely affect water quality or adversely impact fish, wildlife, or plant habitat and the granting of the variance will be in harmony with the general spirit and intent of the Critical Area Law, the Talbot County Critical Area Plan and the regulations adopted in the Ordinance. While the walkways exceed that which is normally required to provide direct access to a pier on the property the excess is minimal and can easily be mitigated.

██ In this appeal, neither side argues that the Board should not have considered Leah's disability. Rather, Appellants would have us affirm the Board because, on this record, the ADA compels that result. Appellee, alternatively, would have us declare as moot the issue of the ADA's application and effect on the case because Bill No. 741 "answers the question of whether the ... Board ... may make reasonable accommodation to the zoning laws to accommodate a citizen with a disability under the [ADA]." Under the arguments offered by either side in this case, the Board's legal ability to do what it did is not in question. Only the wellspring of that authority is quarreled over. The Mastandreas, as the prevailing parties in the administrative proceeding, will garner no additional or different relief if they are correct in their appellate arguments. The Commission concedes that the Board has the abstract legal authority to grant a variance as a reasonable accommodation to a disabled person.[18] Consequently, there is no actual case or controversy as to the flagship issue in this case for us to decide. Because we do not exist merely to resolve academic disputes between appellants, *see County Comm'rs v. Secretary of Health and Mental Hygiene*, 302 Md. 566, 568, 489 A.2d 1127 (1985) (noting "appellate courts do not render advisory opinions on academic or abstract propositions"); *Attorney General v. Anne Arundel County Sch. Bus Contractors Ass'n.*, 286 Md. 324, 328, 407 A.2d 749, 752 (1979) (same), no matter how interesting, the question of the source

---

**18.** The Commission maintains, however, that the grant of the variance in this case was not merited on the record. We shall address this argument *infra*.

of legal authority for the Board's consideration of reasonable accommodations to a disabled person in a variance proceeding need not be resolved in this case.

Bill No. 741, within its scope, aims at the same purposes as Title II of the ADA.[19] Specifically, Bill No. 741 authorizes the Board of Appeals to make reasonable accommodations for the benefit of disabled citizens in the consideration of any final order or decision of the Planning Officer or any administrative appeal, special exception, or variance; establishes criteria for so doing; and limits the environmental impact of any such accommodation in the Critical Area. Given that Bill No. 741 is consistent with the Board's grant of the Mastandreas' variance, we find it unnecessary to answer in this case the question of whether Title II of the Americans With Disabilities Act (42 U.S.C. §§ 12131–12134) applies to the administration and enforcement of the Talbot County Zoning Ordinance and, if applicable, would have compelled the Board's grant of the requested variance. Accepting for the purposes of argument only that the Mastandreas' disabled daughter has a legal right as asserted under Section 12131(c) of the ADA[20] and Z.O.

---

**19.** 42 U.S.C.A. § 12101(b) provides that the purpose of Title II of the ADA is:

> (1) to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;
> (2) to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities;
> (3) to ensure that the Federal Government plays a central role in enforcing the standards established in this chapter on behalf of individuals with disabilities; and
> (4) to invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities.

The House Report accompanying the consideration and passage of the Americans With Disabilities Act explained that "Title II of the ADA specifies that no qualified individual with a disability may be discriminated against by a department, agency, special purpose district, or other instrumentality of a State or a local government." H.R.Rep. No. 485(II), at 6 (1990). Compare to the text of Bill No. 741, *supra* at pp. 121–24.

**20.** A qualified individual with a disability is defined by 42 U.S.C.A. § 12131(2) as:

§ 19.14(b)(7)(ii)(b), recourse to the local ordinance is as far as this Court need look to vindicate that right in the context of this record.[21]

### B.

Regardless of whether Title II of the ADA and/or Bill No. 741 applies to the present case, Appellee argues that the Mastandreas do not have a legal right under the ADA or Z.O. § 19.14(b)(7)(ii)(b) because they do not meet prongs two and three of the three-prong test provided in *Smith–Berch, Inc. v. Baltimore County,* 68 F.Supp.2d 602 (D.Md.1999), which requires a plaintiff attempting to establish disability discrimination in violation of Title II of the ADA to prove "(1) that he has a disability; (2) that he is otherwise qualified for the employment or benefit in question; and (3) that he was excluded from the employment or benefit due to discrimination solely on the basis of the disability." *Id.* at 620. According to Appellee, the Mastandreas ask us to hold that "a local zoning authority must disregard an environmental protection statute to permit a purely private recreational structure for a

---

an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.
A review of the Act's legislative history defines disability as:
(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
(2) a record of such an impairment; or
(3) being regarded as having such an impairment.
H.R. Report No. 485(I), at 64–65 (1990). The House Report specifically includes muscular dystrophy, the impairment from which Leah suffers, under the first prong. *See infra* note 20 for record evidence of Leah's impairment.

21. Two letters in the record attest to Leah's disability. One letter, dated 3 July 1997 from the Head of the Division of Pediatric Neurology at Henry Ford Hospital in Detroit, Michigan, lists the numerous symptoms of the "progressive, disabling muscular dystrophy known as myotonic dystrophy" from which Leah suffers. The second letter, dated 7 July 1997, confirms Leah's diagnosis and indicates her illness will "result[ ] in eventual confinement to a wheelchair...."

person who does not otherwise qualify for the governmental benefit (the zoning variance)." *See* Appellee's Brief, at 19.

The Mastandreas' reply that the court in *Smith–Berch* expounded that Title II "provides very little guidance by way of defining exactly what constitutes 'discrimination' within the meaning of the statute," thus necessitating the court's reliance on the Department of Justice's Title II implementing regulations.[22] *Id.* Specifically, the court noted that the regulations provide that the ADA provision applies to "policies and practices that are neutral on their face, but deny individuals with disabilities an effective opportunity to participate." *Smith–Berch*, 68 F.Supp.2d at 620. The Mastandreas argue that Title II is intended, therefore, to cover neutral policies, such as Z.O. § 19.14(b)(3)(iv), which have a disproportionate impact on disabled individuals. We address this argument, although declining to reach Appellants' flagship issue of the application *vel non* of the ADA, because Z.O. § 19.14(b)(7)(ii)(a) relies, by express incorporation, on the ADA's definition of what constitutes a "disability" and the implications that necessarily flow from that determination.

■ The pith of the Mastandreas argument is that the Board of Appeals implicitly recognized the need to accommodate disabled persons despite restrictions imposed by the

---

22. Under the regulations, a public entity, "in providing any aid, benefit, or service may not ... [a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others" or "[o]therwise limit [such an individual] in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service." 28 C.F.R. § 35.130(b)(1)(ii), (vii). Furthermore, the regulations prohibit a public entity from "utiliz[ing] criteria or methods of administration ... [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(3)(i). ... Finally, the regulations require that a public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity. 28 C.F.R. § 35.130(b)(7).
*Smith–Berch*, 68 F.Supp.2d at 620–21.

neutral Critical Area zoning criteria and that reasonable accommodations were possible without fundamentally altering the nature of the Critical Area program. We find this argument to be persuasive given the record evidence supporting the Board's conclusion that the pathway in question provides Leah with reasonable and significant use of the lot,[23] but does not impact adversely the Chesapeake Bay.[24] Given the unique dependence many disabled persons have on wheelchairs, the path constitutes a reasonable modification to the relevant zoning ordinance requirement and enables such a disabled person to enjoy the waterfront within the Critical Area buffer equally with a non-disabled person. Thus, we reiterate that, accepting for the purposes of argument only that the Mastandreas' disabled daughter has a legal right as asserted under the ADA and Z.O. § 19.14(b)(3)(iv), recourse to the local ordinance, as enacted in Bill No. 741, is as far as this Court need look to vindicate that right.

## C.

Maryland Rule 8–604(d) provides that "[i]f the Court concludes that the substantial merits of the case will not be determined by affirming, reversing, or modifying the judgment, or that justice will be served by permitting further proceedings, the Court may remand the case to a lower court." In cases where the actions of an administrative body would be erroneous even if the correct standard had been applied to the evidence, it may be appropriate for a trial court to then direct agency action. *See Belvoir Farms v. North,* 355 Md. 259, 272 n. 5, 734 A.2d 227, 235 n. 5 (1999).

In this case, we find no practical reason to remand the case for further consideration by the Board. Review of the record and the Board's written findings of fact and conclusions of law makes clear that the Board took Leah's disability into consideration when making each required finding under Z.O.

---

**23.** *See infra* "Unwarranted Hardship" discussion, pp. 134–37.

**24.** *See infra* "No Adverse Impact" discussion, pp. 139–40.

§ 19.14(b)(3)(iv). By both accommodating Leah's needs and satisfying the requirements of the Zoning Ordinance, the Board acted within the scope of both Title II of the ADA and Bill No. 741. The Board, in effect, applied the correct standard in considering the Mastandreas' variance application, regardless of which standard it considered. It appears the Board would have acted no differently had Bill No. 741 been in effect when the Board granted the variance. Therefore, there is no purpose to be served by a remand, if the Board's findings and conclusions are sustainable otherwise on the record before it.

## III.

■ Our role in reviewing whether the Board, as an administrative agency, correctly reached the conclusions required by the Zoning Ordinance for the grant of a variance in the Critical Area buffer "is precisely the same as that of the circuit court." *White v. North,* 121 Md.App. 196, 219, 708 A.2d 1093, 1105 (1998), *rev'd on other grounds,* 356 Md. 31, 736 A.2d 1072 (1999). This means we must review the administrative decision itself. *See Id.*

■ We have stated that "the correct test to be applied [to the judicial review of zoning matters] is whether the issue before the administrative body is 'fairly debatable,' that is, whether its determination is based upon evidence from which reasonable persons could come to different conclusions." *White v. North,* 356 Md. 31, 44, 736 A.2d 1072, 1079–80 (1999) (internal citation omitted). For its conclusions to be "fairly debatable," the Board's decision to grant the variance must have been based on substantial evidence. *Id.; see also Mayor of Annapolis v. Annapolis Waterfront Co.,* 284 Md. 383, 398, 396 A.2d 1080, 1089 (1979) (defining substantial evidence as both "such evidence as a reasonable mind might accept as adequate to support a conclusion" and "whether a reasoning mind reasonably could have reached the factual conclusion the agency reached"(internal citations omitted)). Under the substantial evidence test, "[t]he heart of the fact-finding process

often is the drawing of inferences made from the evidence. . . . The court may not substitute its judgment on the question whether the inference drawn is the right one or whether a different inference would be better supported. The test is reasonableness, not rightness." *Annapolis Waterfront Co.,* 284 Md. at 398–99, 396 A.2d at 1089 (quoting 4 K. DAVIS, ADMINISTRATIVE LAW, § 29.05, at 137, 139 (1958)).

### Z.O. § 19.14(b)(3)(iv)(a)—Unwarranted Hardship

The Commission argues that there was no special condition or circumstance unique to the land or structure that would cause an unwarranted hardship if the Mastandreas were required to comply with the impervious area buffer requirement of the Talbot County Critical Area Program embodied in Z.O. § 19.12(b)(5)(iii)(c). Specifically, the Commission contends that the Mastandreas' desire to provide complete access along the shoreline of the property does not relieve them from this requirement. The Commission also argued that, "at most," the denial of the variance would cause the Mastandreas an "inconvenience," not an unwarranted hardship, because relocating the lateral pathways outside of the buffer area would not prevent a reasonable and significant use of the "entire" property.

In *White v. North,* we were asked whether the Anne Arundel County Board of Appeals properly granted the Whites a variance to construct a swimming pool in their backyard which, because of its slope, was within the extended Critical Area buffer provided for by the Chesapeake Bay Critical Area regulations. 356 Md. 31, 38, 736 A.2d 1072, 1076 (1999). After an extensive review of the Chesapeake Critical Area Program, we focused on Anne Arundel County Code Article 3, § 2–107, which governs the issuance of a Critical Area variance and which lists a series of factors, similar to the ones in the present case, which an applicant must persuade the Board are satisfied.[25] *White,* 356 Md. at 44–49, 736 A.2d

---

**25.** Anne Arundel County Code Article 3, § 2–107 stated in relevant part:

at 1080–82. We initially explained that the first factor, whether "strict implementation of the County's Critical Area program would result in an unwarranted hardship," was the determining consideration. *White*, 356 Md. at 48–52, 736 A.2d at 1080–84. We concluded that the other factors provided guidance for the unwarranted hardship analysis, and resolved that the question was not whether the Whites' variance request met every factor in Anne Arundel County Code § 2–107, but whether the information derived from all of those factors amounted to an unwarranted hardship. *Id.* Moreover, we added that forcing compliance with every individual factor might have unconstitutional taking implications.[26] *White*, 356 Md. at 49, 736 A.2d at 1082.

---

(b) For a property located in the Critical Area, a variance to the requirements of the County Critical Area program may be granted after determining that:
(1) due to the features of the site or other circumstances other than financial considerations, strict implementation of the County's Critical Area program would result in an unwarranted hardship to the applicant;
(2) a literal interpretation of the Code of Maryland Regulations, Title 27, Subtitle 01, Criteria for Local Critical Area Program Development, or the County Critical Area Program and related ordinances will deprive the applicant of rights commonly enjoyed by other properties in similar areas within the Critical Area of the County;
(3) the granting of the variance will not confer on an applicant any special privilege that would be denied by COMAR, Title 27, Subtitle 01 or the County Critical Area Program to other lands or structures within the County Critical Area;
(4) the variance request:
(i) is not based on conditions or circumstances that are the result of actions by the applicant; and
(ii) does not arise from any condition relating to the land or building use, either permitted or non-conforming, on any neighboring property; and
(5) the granting of the variance:
(i) will not adversely affect water quality or adversely impact fish, wildlife, or plant habitat within the County's Critical Area; and
(ii) will be in harmony with the general spirit and intent of the County Critical Area program.

**26.** Specifically, we concluded that
[i]f total compliance with every specific requirement [of a zoning ordinance] were necessary, relief would be nearly impossible and

When discussing the unwarranted hardship standard in *White,* we relied on our previous analysis of a similar issue in *Belvoir Farms v. North,* 355 Md. 259, 734 A.2d 227 (1999). There, we defined "unwarranted hardship" as "a denial of reasonable and significant use" of the land. *Belvoir Farms,* 355 Md. at 282, 734 A.2d at 240. In explaining this standard, we made clear that unwarranted hardship is a lesser standard than that required to prove an unconstitutional taking. *Id.* Moreover, we determined that "[w]hether a property owner has been denied reasonable and significant use of his property is a question of fact best addressed by the expertise of the Board of Appeals, not the courts." *Id.*

 The Board in this case, therefore, did not have to consider whether denying the variance would have denied the Mastandreas a reasonable and significant use of the "entire" lot. Rather, the Board was required to (and did) consider whether the property owners, in light of their daughter's disability, would be denied a reasonable and significant use of the waterfront of their property without the access that the path provided. There is substantial evidence in the record establishing that, without the path, a person in a wheelchair could not enjoy the waterfront portion of the property.[27]

Evidence before the Board indicated that the soil composition of the Mastandreas' property near the shoreline, "one of the heaviest clay soils" their expert "had ever tested," does not allow handicap access to the waterfront.[28] The record indicates that the Commission neither offered any evidence to

---

serious "taking" questions might arise. It is our view that these specifically stated requirements are to be considered in the context of the entire variance ordinance, to the end that, when interpreted as a whole, either they are or are not *generally* met.
*White v. North,* 356 Md. 31, 50, 736 A.2d at 1072, 1083 (1999).

27. *See supra* pp. 115–17.

28. William Sweitzer, a marine contractor engaged by the Mastandreas to install the pier and the bulkheads, testified that his backhoe, equipped "with aggressive tractor grid," was slipping and sliding on the ground during the construction. He described the soil adjacent to the creek as "greasy" when wet and difficult to grow grass on.

the contrary nor questioned the Mastandreas' expert witness on this point when he testified before the Board. The Commission did not offer such evidence apparently because it did not conduct any site-specific studies or project a quantifiable adverse impact of the path on the Critical Area buffer or Glebe Creek. In other words, there is no evidentiary refutation by the Commission on the record that would support its argument that the Mastandreas' property is not unique or "in any way different from other properties in the neighborhood or in the Talbot County Critical Area." *See* Appellee's Brief, at 23.

The record evidence supports the Mastandreas' assertion, and substantiates the Board's finding, that there was a special condition or circumstance unique to the lot. The record also supports the Board's finding that, without the pathway in question, Leah would not be able to access reasonably the rear yard, view wildlife along the water's edge, or participate in shoreline-oriented activities. In light of the evidence before the Board, we find no reason to question the presumed expertise of the Board in reaching the conclusions it did.

*Z.O. § 19.14(b)(3)(iv)(b)—Commonly Enjoyed Rights*

The Commission suggests that the Board incorrectly determined that a literal interpretation of the Z.O. would deprive the Mastandreas of rights commonly enjoyed by others in the Critical Area. It argues that all property owners would be barred from constructing brick pathways within the Critical Area buffer and that denial of the Mastandreas' variance, therefore, would not deprive them of any rights commonly enjoyed by others in the Talbot County Critical Area.

We are unable to say that the Board unreasonably concluded that the Mastandreas were not in the same position as other property owners in the same zone because, without the path within the buffer, the Mastandreas, but most particularly, Leah, could not enjoy their waterfront property. Unlike able-bodied property owners, Leah would be unable to navigate the

waterfront portion of the property without the wheelchair-accessible path because of the risks posed by the property's natural slope and soil composition.

The Board recognized that a literal application of the Z.O. would deprive Leah of an ability to enjoy the property on which she resides as others in the area similarly situated may enjoy theirs without the need for a similar path. By providing a reasonable accommodation for Leah's special circumstances, the Board prevented discrimination by virtue of her disability and thereby provided her with a reasonable use and enjoyment of the property. Had Bill No. 741 been in effect at the time, the Board's action would be entirely consistent with the bill's purpose in permitting this reasonable accommodation to reduce the otherwise discriminatory effect of the Z.O. and to restore Leah's reasonable use and enjoyment of the property. Z.O. § 19.14(b)(7)(ii)(c).

### Z.O. § 19.14(b)(3)(iv)(c)—Special Privilege

■ The Commission claims that there was no evidence before the Board to support its finding that granting the variance to the Mastandreas would not confer a special privilege on the Mastandreas. It argues that no one has the right to build the "most desirable, maximum access along the shoreline for every resident of the household." We find, however, that there was substantial evidence in the record upon which the Board could (and did) conclude reasonably that granting the variance would simply put Leah in a similar position as occupants of other properties in the same zone who were able to enjoy their property without such a wheelchair-accessible path. The path was a reasonable accommodation that may be granted to others in similar circumstances. Furthermore, we reiterate our conclusion that such a reasonable accommodation of Leah's disability would be consistent with Z.O. § 19.14(b)(7)(ii)(c) so as to reduce the otherwise discriminatory effect of the ordinance and to restore Leah's reasonable use and enjoyment of the property.

*Z.O. § 19.14(b)(3)(iv)(d)—Actions Not
the Result of Property Owner*

■■ The Commission questions how the Board concluded
that the variance was not based on conditions or circum-
stances that resulted from the Mastandreas' actions when the
Board stated that "[b]y their actions the Applicants purchased
the property and placed the pathways where they are." We
believe the Commission misapprehends the language of this
ordinance provision and the Board's conclusion. Leah's dis-
ability is an unfortunate, naturally-occurring condition. The
Board stated that the special circumstances which necessitat-
ed the purpose for the path obviously "were not the result of
the [Mastandreas'] choice." The Mastandreas' desire to pro-
vide wheelchair access to much of their property for their
daughter is a circumstance which pre-dated construction of
the actual path. There was substantial evidence in the record,
in the form of several letters from medical personnel,[29] on
which the Board could have relied (and did rely) in reaching
this conclusion. Based on this evidence, the Board properly
concluded that the paths were the least objectionable means to
accommodate Leah's disability and to provide her with a
reasonable use of the family property. Z.O.
§ 19.14(b)(7)(ii)(f).

*Z.O. § 19.14(b)(3)(iv)(e)—No Adverse Effects*

■■ The Commission suggests that the Board did not
address the fact that "greater profitability or lack of knowl-
edge of restrictions" is not a sufficient cause for granting a
variance. The Commission is correct in the abstract. The
Board did not discuss this factor, but it did not do so because
this factor is not part of the Critical Area criteria. What the
Commission mistakenly refers to is Z.O. § 19.14(b)(3)(iii),
which requires an application in the Non–Critical Area to meet
five criteria. Specifically, Z.O. § 19.14(b)(3)(iii)(c) states,
"[g]reater profitability or lack of knowledge restrictions shall
not be considered as sufficient cause for a variance." Because

---

**29.** *See supra* note 21.

the pathways in question are located within the Critical Area, the variance request as to it would be governed by the provisions of Z.O. § 19.14(b)(3)(iv), not the Non–Critical Area factor suggested by the Commission.

Zoning Ordinance § 19.14(b)(3)(iv)(e) is the appropriate criteria considered by the Board. This section states:

The granting of a variance within the Critical Area will not adversely affect water quality or adversely impact fish, wildlife, or plant habitat and the granting of the variance will be in harmony with the general spirit and intent of the Critical Area Law, the Talbot County Critical Area Plan and the regulations adopted in this Ordinance.

The Mastandreas presented the Board with ample evidence that the path would not have an adverse affect on the surrounding environment. The Board noted that although the creekside path exceeded that which is required normally to provide direct access to a pier on the property, the excess is minimal, amounting to less than 4% of the total land area within the buffer. Accepting that the brick-in-sand path is actually three times as permeable as the surrounding lawn, the Board also found that any effect the path may have was "easily" mitigated by the approximately 2000 new plantings on the property.

In contrast, the Commission provided the Board with no evidence that the placement of the brick-in-sand path at its specific location within the 100 foot buffer would affect adversely water quality or adversely impact fish, wildlife, or plant habitat. Specifically, the Board found that the Commission conducted no permeability or run-off tests to support its contention that the pathway would have a negative impact. The Board, therefore, permissibly decided that the path met the criteria in this section. Additionally, the evidence supporting the Board's decision is consistent with the criteria of Bill No. 741, as the brick-in-sand path on this record is no worse than environmentally neutral. Z.O. § 19.14(b)(7)(ii)(e).

*Z.O. § 19.14(b)(3)(iv)(f)—Variance Does
Not Exceed Minimum Adjustment*

The Commission asserts that the Board adopted an oxymoronic concept of "minimal excess" in determining that the path could both "exceed that which is normally required to provide direct access to a pier on the property" and be considered "minimal" and easily mitigated. We read the Board's findings differently. First, the pier access mentioned by Appellee is not at issue. Second, the Board was presented with specific facts from which it could compare what shoreline access is normally permitted under the Critical Area criteria and what shoreline access the Mastandreas constructed within the Critical Area buffer to accommodate their disabled daughter. The relevant paths, those within the Critical Area buffer, constitute only 4% of the entire buffer area on the lot. The Board found that such a percentage could be described accurately as "minimal excess" or, if the Commission prefers, "the minimum adjustment necessary," to provide Leah with a reasonable and significant use of the property. In accordance with Bill No. 741, the path undoubtedly also would be found to be the minimal environmental changes necessary to meet Leah's physical limitations. Z.O. § 19.14(b)(7)(ii)(f).

*Z.O. § 19.14(b)(3)(iv)(g)—In Harmony with
Spirit and Intent of Zoning Ordinance*

■■ The Commission makes several assertions regarding the Board's application of this factor of the Zoning Ordinance. First, the Commission argues that perhaps the most important of the seven variance factors is that the variance be in "harmony with the general spirit and intent of the Critical Area Law." This hierarchal statement is not correct. As we observed earlier in our discussion of *White v. North, supra,* the other factors of a variance ordinance, apparently including the "harmony" factor here, provide illumination for the primary unwarranted hardship analysis.

■■■ Second, the Commission argues that the Board's finding that the path is in harmony with the spirit and intent

of the Zoning Ordinance is arbitrary and capricious. The foundation of its argument is that, when viewed with a broader perspective and considered in conjunction with the impact of other impervious structures within the buffer, granting the variance would violate Talbot County's intent to protect its Critical Areas. The Commission's argument in this regard is too extreme. With its logic, no variances would ever be granted for fear that, one day, they could have a negative cumulative effect on their environs. In our opinion, the intent of the Zoning Ordinance is aimed at the cautious and thoughtful consideration and, where appropriate, granting of variances within the Critical Area on a case-by-case basis. Under Talbot County law, such variances are appropriate when their applications meet the Critical Area criteria [30] and, where necessary, create reasonable accommodations for the needs of disabled citizens.

Although the Mastandreas' paths did create some 5000 square feet of new impervious surface area within the buffer, the evidence indicated that the brick-in-sand path was actually three times as permeable as the surrounding natural lawn, and that much of the potential increase in runoff from the other pertinent pathways was mitigated by landscaping. The Board's conclusion that these extensive mitigating factors do not impact adversely fish, wildlife, or plant habitat and are in harmony with the Zoning Ordinance's intent was supported by the record evidence. Furthermore, the Board's conclusions regarding these mitigating factors are in accordance with Bill No. 741, being "environmentally neutral" and not "substantially impair[ing]" the intent of the variance ordinance. Z.O. § 19.14(b)(7)(ii)(d).

## CONCLUSION

In conclusion, we find that the Board considered all of the factors required under Talbot County Zoning Ordinance § 19.14(b)(3)(iv) and, after weighing the evidence before it,

---

**30.** *See supra* pp. 114–15, 121–24.

permissibly decided to make a reasonable accommodation of Leah Mastandreas' disability in granting the variance for the pathway in the Critical Area buffer parallel to Glebe Creek. Given the substantial evidence before the Board and the Board's application of the variance criteria to that evidence, we hold that there was no basis for the Circuit Court's reversal. The Mastandreas and the Board have met generally the requirements of the Talbot County Zoning Ordinance.

**JUDGMENT OF THE CIRCUIT COURT FOR TALBOT COUNTY REVERSED; CASE REMANDED TO THE CIRCUIT COURT WITH DIRECTIONS TO AFFIRM THE DECISION OF THE BOARD OF APPEALS OF TALBOT COUNTY IN BOARD APPEAL NO. 1053; COSTS TO BE PAID BY APPELLEE.**